# Exhibit PD-1

Lābb

# Exclusive Supplier Agreement

**FAS-TES FRANCHISE SYSTEMS, LLC & RAMSEY DIAGNOSTICS CORPORATION, D/B/A/ LABB**

**Created by:**

JAMES RAMSEY RAMSEY DIAGNOSTICS CORPORATION D/B/A/ LABB

**Prepared for:**

DAVE CLAFLIN FAS-TES FRANCHISE SYSTEMS, LLC

**EXCLUSIVE SUPPLIER AND MODIFIED SOFTWARE DEVELOPMENT AGREEMENT**

**Effective Date:** December 21, 2022

This Exclusive Supplier and Modified Software Development Agreement ("Agreement") is reached and made effective by and between Ramsey Diagnostics Corporation d/b/a Labb (“Labb”), a corporation organized and maintained pursuant to the laws of the Commonwealth of Virginia, and Fas-Tes Franchise Systems, LLC (“FL”) as of the Effective Date set forth above and provides as follows, to wit:

**RECITALS:**

WHEREAS, LABB has developed a system of proprietary software including both source code and inferencing engine and technology to read, interpret, verify, record, communicate, and archive results of drug tests and other toxicology screenings gathered for and submitted by employers and prospective employers (the “Core Software”); and

WHEREAS, Labb continues to expand the capabilities and functionality of the Core Software; and

WHEREAS, FL wishes to engage LABB to develop a specialized adaptation of the Core Software with additional unique and proprietary software, source code, and inferencing engine in order to address the specific needs of FL (the “Modified Software”), and LABB is willing to accept the engagement to provide such Modified Software on the terms and conditions set forth in this Agreement; and

WHEREAS, FL is a franchisor and maintains an expanding network of current and future franchisees (a person or entity which is a franchisee of FL as of the Effective Date is a “Current FL Franchisee”, and a person or entity which becomes a franchisee of FL after the Effective Date is a “Future FL Franchisee; they are referred to collectively herein as “Current and Future FL Franchisees”) which will be required to, and shall, use the Modified Software at all times following its release in order to operate their franchises; and

WHEREAS, Labb is willing to grant a license to FL for Current and Future FL Franchisees to use the Modified Software (the “License”) as part of this Agreement in exchange for the License Fee as defined in Exhibit B of this Agreement; and

WHEREAS, FL and the Current and Future FL Franchisees are in need of reliable and readily available testing equipment and services in order to provide to their respective customers a system by which FL and the Current and Future FL Franchisees screen various persons for the presence and amount of specific drugs of abuse, including but not limited to ethanol, amphetamines, cocaine, marijuana, opiates, benzodiazepines, barbiturates, methadone, buprenorphine, methaqualone, phencyclidine, Propoxyphene, 6-mam, EDDP, LSD and document the results of such screening; and

WHEREAS, Labb offers drug testing equipment and services as set forth in Section 1 below through the sale and use of Labb's proprietary, accurate, and easy-to-use screening kits ("e-tests"), its Labb Station drug testing machine, training materials, mobile devices, and apps and through access to Labb's system for collecting and evaluating specimens and documenting the results thereof as operated through its Core Software (collectively, the "Products and Services"); and

WHEREAS, FL and Labb desire by this Agreement to set forth the terms and conditions under which FL and the Current and Future FL Franchisees will exclusively purchase and use Products and Services from Labb for all drug tests and related services which FL and the Current and Future FL Franchisees will sell or provide to or perform for their respective customers.

NOW, THEREFORE, incorporating the Recitals above as if set forth in their entirety below and for and in consideration of the mutual promises and undertakings of Labb and FL (collectively, the "Parties," each of which is a "Party") set forth hereinbelow and other good and valuable consideration, the receipt and sufficiency of which each of the Parties hereby acknowledges, the Parties mutually agree as follows:

**1. Exclusive Drug Abuse Products and Services.**

(a) Commencing on the Effective Date and continuing while this Agreement is in effect, except as set forth in Section 1(b) below, FL will require each of its Current and Future FL Franchisees to purchase the following Products and Services exclusively from Labb and to use them exclusively for all drug tests and related services which FL and the Current and Future FL Franchisees will sell or provide to or perform for their respective customers:

(1) The Labb Station drug testing machine, to include any modifications thereof;

(2) Labb's digital e-tests and readers to collect and to evaluate specimens;

(3) Labb's designated laboratory and Medical Review Officer for further evaluation of all "non-negative" test results collected using Labb's digital e-tests and readers;

(4) Reporting by Labb or its authorized designees of all results of the further evaluation of "non-negative" tests, subject to, and to the extent permitted by, applicable legal standards and, where applicable, the Department of Health and Human Services Guidelines for Federal Workplace Drug Testing Programs (the "Guidelines");

(5) Labb's archiving and storage of all test results and information associated therewith for a period of seven (7) years from the date such test result and information is either collected or received by Labb, whichever occurs later; and

(6) All other Products and Services listed on Exhibit A (attached hereto and hereby incorporated by reference) sold and/or provided by Labb.

(b) Notwithstanding the foregoing, during only the first 365 days after the Effective Date (that 365 day period is the "First Year"), the Current and Future FL Franchisees shall not be required to purchase on an exclusive basis from Labb items (3), (4), and (5) listed in Section 1.(a) of this Agreement or those items listed under the headings of Confirmations: Urine, Confirmations: Oral Fluid and DOT/STL on Exhibit A. This non-exclusive purchase and use exception applies only for the First Year, and at the conclusion of the First Year, the exclusive purchase and use requirements for Current and Future FL Franchisees will apply to all Labb Products and Services set forth in Section 1.(a) and Exhibit A of the Agreement.

(c) In the event that a client or clients of FL's Current and Future Franchisees require specialized laboratory work or testing that cannot be provided by Labb and FL has approved such special laboratory work in writing and notified Labb of its approval, such special laboratory work will not be considered a violation of the requirements of Section 1.(a) of this Agreement. FL agrees, however, that it will not provide approval for such special laboratory work to the extent such work will exceed more than ten percent (10%) of the Franchisee's total testing per unit volume measured over a period of two (2) years. "Special Laboratory Work" will be defined as laboratory services provided by a laboratory other than Labb for a Current FL Franchisee or Future FL Franchisee, despite such laboratory services being ones that Labb offers and are included among its Products and Services, because a client of the Franchisee requires use of the non-Labb laboratory.

(d) In the event a Current FL Franchisee or a Future FL Franchisee uses a product for its drug tests and related services for which Labb does not offer a similar or equal product, such use will not be considered a violation of Section 1.(a) of this Agreement. However, if Labb subsequently offers a similar or equal product as one of its Products, then this exclusion will no longer be in effect.

**2. Price and Payment.**

(a) ***Price***. FL agrees to pay to Labb on the Effective Date the Initial Payment set forth on Exhibit B. Each of the Current and Future FL Franchisees agrees to pay Labb for the Products and Services it purchases and/or uses in accordance with the pricing and other terms set forth on this Agreement's Exhibit A and Exhibit B, which are hereby incorporated herein by reference.

(b) ***Payment by Franchisees.*** Before Labb will ship Products or provide Services to a Current and Future FL Franchisee, the Franchisee must provide to Labb valid and sufficient information to enable Labb to receive payment for the Products and Services via a credit card or other mode of payment acceptable to Labb ("Payment Information") along with written authorization for Labb to make charges to, and receive payment from, that credit card or other mode of payment for Products

and Services sold to the Franchisee by Labb. All Products purchased and associated shipping costs will be billed pursuant to the Payment Information for immediate payment to Labb when shipped to the purchasing Franchisee (Current and Future FL Franchisees are referred to individually herein as a "Franchisee") by Labb. For all Labb services for which billing must occur after the services are provided, Labb will generate and send to the purchasing Franchisee an invoice indicating the services performed, the number of units of each service for which the Franchisee is being billed, the cost per service rendered, and the total cost to the purchasing Franchisee. The total cost of the Labb services provided to the Franchisee will then be billed pursuant to the Franchisee's Payment Information for immediate payment to Labb via the Payment Information. If any charge for Products or Services is rejected, not paid or charged back by the purchasing Franchisee's credit card provider, the purchasing Franchisee must make payment in full of the amount due to Labb within thirty (30) days of the date Labb's charge to the credit card is disallowed. The invoiced Franchisee will also pay Labb interest on the unpaid balance at the rate of the lesser of 1.5% per month or the highest rate allowed under the laws of the Commonwealth of Virginia until paid, as well as all fees, including reasonable attorney's fees, costs and expenses incurred by Labb in collecting the amount due. Until such time as the delinquent Franchisee makes payment in full to Labb for unpaid charges for Products and Services provided by Labb and gives Labb a new and valid credit card number for future purchases of Products and Services, Labb will not be under any obligation to ship any additional products to or provide any additional services to the Franchisee.

(c) ***Binding on Franchisees.*** FL REPRESENTS AND WARRANTS TO LABB THAT (1) FL HAS THE LEGAL AUTHORITY AND ACTUAL RIGHT UNDER THE TERMS OF ITS FRANCHISE AGREEMENT WITH EACH CURRENT FL FRANCHISEE TO BIND, AND BY SIGNING THIS AGREEMENT DOES HEREBY BIND, EACH CURRENT FL FRANCHISEE TO THE TERMS, REQUIREMENTS AND OBLIGATIONS OF THE CURRENT AND FUTURE FL FRANCHISEES SET FORTH IN THIS AGREEMENT, INCLUDING, BUT NOT LIMITED, TO THE OBLIGATION TO INSTALL THE MODIFIED SOFTWARE UPON ITS RELEASE AND TO USE IT AT ALL TIMES IN CONNECTION WITH ALL DRUG TESTING AND RELATED SERVICES THE FRANCHISEE PERFORMS, AND (2) THAT AFTER THE EFFECTIVE DATE, FL WILL NOT ENTER INTO A FRANCHISE AGREEMENT WITH ANY FUTURE FL FRANCHISEE WHICH DOES NOT INCLUDE A BINDING AND ENFORCEABLE UNDERTAKING BY THE FUTURE FRANCHISEE TO BE BOUND IMMEDIATELY BY THE TERMS, REQUIREMENTS, AND OBLIGATIONS OF THE CURRENT AND FUTURE FL FRANCHISEES SET FORTH IN THIS AGREEMENT, INCLUDING, BUT NOT LIMITED TO, THE OBLIGATION TO INSTALL THE MODIFIED SOFTWARE UPON ITS RELEASE AND TO USE IT AT ALL TIMES IN CONNECTION WITH ALL DRUG TESTING AND RELATED SERVICES THEY PERFORM. FL FURTHER REPRESENTS AND WARRANTS TO LABB THAT FL WILL TAKE ALL ACTIONS NECESSARY TO ASSURE THAT EVERY CURRENT FL FRANCHISEE IS, AND EVERY FUTURE FL FRANCHISEE WILL BE, LEGALLY AND CONTRACTUALLY BOUND TO THE TERMS, REQUIREMENTS AND OBLIGATIONS OF THE CURRENT AND FUTURE FL FRANCHISEES SET FORTH IN THIS AGREEMENT. FL will provide each Current and Future FL Franchisee a statement in the form attached as Exhibit C, which is incorporated herein by reference, acknowledging that the Franchisee has received a copy of this Agreement, acknowledging that it is bound by the terms of the Agreement applicable to Current and Future FL Franchisees, and providing credit card information and authorization for Labb to bill to such credit card for Products and Services sold/rendered to the Franchisee. Each Current FL Franchisee, as well as Future FL Franchisee, will be required to complete and sign a copy of Exhibit C and return it to Labb, Labb is not obligated to ship, provide Goods or Services to, or allow the use of the Modified Software by any Franchisee from which

Labb has not received and accepted a copy of Exhibit C completed to Labb's satisfaction by the Franchisee.

(d) ***Unauthorized Purchases.*** In the event any Franchisee fails to comply fully with the requirements of Sections 1.(a) and 1.(b) hereinabove, then the breach by the Franchisee will also be deemed, and shall constitute, a breach by FL (the Franchisee breach and the resulting breach by FL being collectively a "Breach of Exclusivity"). In the event of a Breach of Exclusivity discovered by Labb or reported to Labb by FL or FL's Franchisee, FL, subject to Labb's rights pursuant to Section 4.(f) of this Agreement, will have thirty (30) days to cure the Breach of Exclusivity by (i) auditing the offending Franchisee's records to verify the Breach of Exclusivity and (ii) paying Labb liquidated damages ("Damages") equal to the price the Franchisee would have paid Labb had the Franchisee purchased and used Labb's Products and Services for all drug tests and related services which the Franchisee sold or provided to or performed for the Franchisee's customers. It is agreed that in the event of a Breach of Exclusivity, Labb would suffer actual damages, the precise calculation of which would be very difficult and time consuming but the Damages calculated as provided in the preceding sentence bear a reasonable and approximate relationship to the actual damages Labb would suffer and do not constitute a penalty. The Damages will be paid by FL to Labb within thirty (30) days of the conclusion of FL's audit of the Franchisee.

**3. Limited Warranties and Remedies.**

(a) ***Warranty***. Labb warrants to FL and the Current and Future FL Franchisees that the Products will conform to applicable industry standards for functionality and accuracy and that Labb and its authorized designees will render the Services in a manner which conforms to applicable industry standards. Notwithstanding anything to the contrary elsewhere herein, the warranty in the preceding sentence will not apply, and Labb will have no liability for, (i) delays beyond the reasonable control of Labb in reporting results; (ii) delays or errors on the part of any clinic, laboratory, Medical Review Officer, or entity which ships, transports or delivers specimens; (iii) any non-conforming Products having a unit price of tender under Fifteen Dollars ($15.00) unless multiple items are non-conforming from the same shipment of goods from Labb such that the total cost of the non-conforming goods exceeds Fifteen Dollars ($15.00); or (iii) errors or omissions on the part of FL or any of the Current and Future FL Franchisees.

(b) ***Limitation of Warranties***. THE WARRANTY SET FORTH HEREINABOVE IN SECTION 3.(a) IS IN LIEU OF ALL OTHER WARRANTIES OR OBLIGATIONS, EXPRESS OR IMPLIED. LABB HEREBY EXPRESSLY DISCLAIMS ALL IMPLIED WARRANTIES, INCLUDING THE IMPLIED WARRANTIES OF MERCHANTABILITY AND OF FITNESS FOR A PARTICULAR PURPOSE.

(c) ***Remedies***. In the event of any breach of warranty by Labb regarding the Products and Services, Labb shall, at Labb's option, (i) replace any non-conforming Products purchased by the affected Franchisee and/or re-perform any non-conforming Services, (ii) refund the amounts the affected Franchisee paid to Labb for the non-conforming Products and/or Services, or (iii) credit the amounts the affected Franchisee paid to Labb for the non-conforming Products and/or Services against other unpaid amounts due to Labb and thereafter as appropriate, against the price of future purchases of Products and Services. .

(d) ***Limitation of Section 3 Remedies and Liability***. FL'S AND EACH OF THE CURRENT AND FUTURE FL FRANCHISEES' SOLE AND EXCLUSIVE REMEDY FOR DEFECTIVE PRODUCTS AND/OR SERVICES SHALL BE REFUND, CREDIT, OR REPLACEMENT/RE-PERFORMANCE AS PROVIDED HEREINABOVE IN SECTION 3.(c). IN NO EVENT SHALL LABB BE LIABLE FOR THE COST OF PROCUREMENT OF SUBSTITUTE PRODUCTS OR SERVICES, LOSS OF PROFITS, OR ANY OTHER SPECIAL, PUNITIVE, CONSEQUENTIAL, OR INCIDENTAL DAMAGES, HOWEVER CAUSED, EVEN IF LABB HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. IF A COURT OF COMPETENT JURISDICTION FINDS THE FOREGOING LIMITATION INAPPLICABLE, UNENFORCEABLE OR UNLAWFUL FOR ANY REASON, THEN LABB'S LIABILITY TO FL AND/OR TO ANY OF THE CURRENT AND FUTURE FL FRANCHISEES FOR ANY CAUSE OF ACTION ARISING UNDER THIS AGREEMENT, SPECIFICALLY INCLUDING, BUT NOT LIMITED TO, BREACH OF WARRANTY SHALL NOT EXCEED THE RESPECTIVE TOTAL MONETARY AMOUNT WHICH THE AFFECTED FRANCHISEE INDIVIDUALLY AND SEVERALLY PAID TO LABB PURSUANT TO THIS AGREEMENT DURING THE SIX (6) MONTHS IMMEDIATELY PRECEDING THE DATE SUCH CAUSE OF ACTION AROSE.

**4. Term and Termination.**

(a) ***Initial Term***. The initial term of this Agreement (the "Term") is ten (10) years unless sooner terminated as hereinafter provided and shall commence on the Effective Date.

(b) ***Early Termination Prior to 24 Months***. FL may not terminate this Agreement at any time or for any reason during the first 24 months after the Effective Date.

(c) ***Early Termination After 24 Months.*** Beginning 24 months after the Effective Date, FL may terminate this Agreement (i) upon written notice of termination to Labb at least ninety (90) days prior to the date such termination takes effect, and (ii) provided the buy-out payment calculated as set forth below (the "Buy-Out") is paid by FL to Labb via wired funds at least three (3) business days before the date such termination takes effect.

(1) The Buy-Out will be comprised of a monetary amount which is calculated by (i) first multiplying $1.90 by the number of e-tests purchased by FL's Current and Future FL Franchisees from Labb during the 90-day period prior to the date written notice of termination was delivered to Labb (the resulting sum shall be referred to as the "Income") and, thereafter, dividing the number of full months remaining in the Term by 12 and multiplying the resulting quotient by the Income and adding to the resulting calculation; (ii) the amount of the License Fees that would have been paid, using the amount of the License Fees, including increasing matters for all full months remaining in the Term.

(2) If (and only if) at the same time FL provides timely and proper notice to Labb of termination of the Agreement FL also provides timely and proper notice to Labb that FL intends to exercise the provisions of Section 5.(a), then upon FL's full and timely payment of the Buy-Out to Labb pursuant to Section 4.(d), FL will be given the option to continue licensing the Modified Software as set forth in Section 5(a) below.

(d) ***Effect of Termination on Franchisees.*** Only FL, and not FL's Current and Future FL Franchisees, has authority to terminate this Agreement, and any termination by FL shall be deemed to have occurred on behalf of, and shall bind, the Current and Future FL Franchisees. Notwithstanding anything to the contrary elsewhere herein, Labb will have no obligation to sell or to provide any Products or Services or Modified Software for use by Current and Future FL Franchisees after termination of the Agreement by FL.

(e) ***Early Termination by Labb.*** In the event more than a total of fifteen (15) or more Breaches of Exclusivity collectively occur after the Effective Date, Labb may terminate the Agreement at any time thereafter by providing FL with written notice of termination of the Agreement at least one hundred eighty (180) days prior to the designated termination date. Otherwise, unless FL is in breach of the terms of this Agreement or fails to make payments due from it to Labb, including failure to pay Damages for a Breach of Exclusivity due under the terms of this Agreement within the time limits set forth in this Agreement, or if there is no specific time limit, then within sixty (60) days of Labb's written demand for payment to FL, Labb will not have a right to unilaterally terminate this Agreement.

**5. Licensing Following Early Termination and Ownership upon Completion of Term or Upon Sale; Survival.**

(a) ***License Current Modified Software.*** No later than ninety (90) days prior to an early termination of the Agreement pursuant to Section 4.(c) above of the Term, FL may notify Labb in writing that FL will continue to license on a year-to-year basis the then-current version of the Modified Software from Labb immediately following the effective date of such termination. In such event, the fee for the continuing license for FL, and thereby its Current and Future FL Franchisees, to continue to use the Modified Software will be paid by FL to Labb monthly calculated at the rate of Five Dollars US ($5.00) per licensed Franchisee testing facility location per month, plus Twenty-five Cents US ($0.25) per digital rapid test interpretation read during the previous month, with the cost per digital read increasing to Fifty Cents US ($0.50) when that digital rapid test interpretation read requires a secondary read. During the continued period of the License, the Current and Future FL Franchisees will be bound to, and shall, continue to exclusively purchase from Labb and use in their drug testing and analysis programs the Products and Services set forth in Section 1 of the Agreement, but each Franchisee will be charged Labb's cost plus twenty percent (20%) for each of the Products and Services purchased or used by the Franchisee.

(b) ***Ownership at End of Term.*** At the end of the Term, and provided FL is not in default under the terms of the Agreement, Labb will transfer ownership of the then-current version of the Modified Software to FL. Labb will work with FL to separate the Modified Software from its Core Software the FL Modified will be a separate software system. All costs and expenses of the separation and independent platform setup for the Modified Software will be paid solely by FL to Labb. Any ongoing maintenance of the Modified Software by Labb will be subject to a separate maintenance agreement agreed to between the Parties. FL will be solely responsible for providing and paying any insurance, security, regulatory filings, services, staff/support, risk and similar costs pertaining to the Modified Software.

(c) ***Asset or Ownership Sale During License Term.*** If during the Term FL plans to sell substantially all of its assets to include this Agreement, or to enter into a merger with another entity and FL will not be the surviving entity, FL must notify Labb in writing at least ninety (90) days in

advance of the proposed sale, transfer or merger, and neither the License nor the Modified Software may be transferred/sold to such acquiring party without the written consent of Labb. Such consent may be withheld by Labb in its absolute and unlimited discretion. However, Labb will consent to the proposed sale, transfer or merger if the acquiring or surviving entity, as a substantive part of the closing of such transaction, agrees and represents to Labb in writing that it, and any and all of its respective current and future franchisees, will be fully bound by the terms of this Agreement as if it was FL and further represents and warrants to Labb that it has the ability and legal authority to fulfill the obligations and responsibilities that are required by FL and its successors. FL affirmatively represents that its ownership will not change by more than thirty-three percent (33%) without FL giving Labb at least ninety (90) days advance notice of such anticipated change and information regarding the person or entity acquiring more than thirty-three percent (33%) of LF's ownership interests. If Labb does not approve of the proposed transfer/sale, it will notify FL in writing of its non-approval within thirty (30) days of the date that it receives notice of the proposed transfer. If approval is not given, Labb may terminate this Agreement by giving FL notice in writing that this Agreement will terminate as of the date the proposed ownership transfer occurs.

(d) ***Survival***. Upon the termination or expiration of the Term, each Party's rights and obligations under this Agreement shall end, and neither Party shall have any claim, including any claim for termination damages, against the other. However, notwithstanding anything to the contrary elsewhere herein, the provisions of this Section 5.(d) and numbered sections 2, 3, 5, 6 and 8 (and their respective sub-sections therein) and the rights and obligations set forth therein shall survive the termination or expiration of this Agreement.

**6. Proprietary Information.**

(a) ***Proprietary Information***. FL and its Franchisees acknowledge that (i) Labb's combined use of the Products and Services in conjunction with proprietary software, in this instance for FL and its Current and Future FL Franchisees, constitutes a unique business process designed to maximize the efficiency of drug testing and analysis beyond the standard in the industry and constitutes a proprietary business process that needs protection, (ii) the prices listed on Exhibit A and Exhibit B, as adjusted annually as provided in Exhibit B, include (or may include in the future) discounts which are not made available to all purchasers of Labb's Products and Services, and are thus proprietary in nature, and (iii) Labb derives value and competitive advantage from controlling the disclosure of its business process and pricing. All said information is deemed Proprietary Information that constitutes valuable special and unique property of Labb.

(b) ***Non-Disclosure***. Neither FL nor the Current and Future FL Franchisees will, for any reason or purpose whatsoever, during the Term and thereafter disclose any of Labb's Proprietary Information without Labb's written authorization. In the event of a breach or threat of breach by FL or any of its Current and Future FL Franchisees of the provisions of this Section 6, including any of its sub-sections, FL and its Current and Future FL Franchisees stipulate that Labb shall be entitled to an injunction restraining FL and/or the offending Franchisee(s) from disclosing Labb's Proprietary Information, and such injunction shall be in addition to, rather than in lieu of, all other legal and equitable relief which is necessary to provide complete relief to Labb from such breach or threat of breach.

(c) ***Exceptions***. This section does not apply to Labb's Proprietary Information that is or becomes publicly available through no fault of FL or its Current and Future FL Franchisees.

**7. Exclusivity of Sales.**

(a) ***Exclusivity.*** ARCpoint Labs Franchise, Any Lab Test Now®, and/or any national franchise whose core business includes rapid and/or laboratory drug testing services across the United States and (the "Competitors") are in direct competition with FL and the Current and Future FL Franchisees. FL and its Current and Future Franchisees want to have exclusive rights to use Labb's Modified Software, as well as to purchase and use the Labb Station drug testing machine, Labb's digital e-tests (the "Designated Products") as opposed to the competitors being able to use/purchase them, during the Term. Labb has agreed not to sell the Designated Products to the Competitors so long as FL's Current and Future Franchisees continue paying prices for e-tests which include a Thirty-Cent US ($0.30) exclusivity premium per e-test sold to them.

(b) ***Termination of Exclusivity.*** FL may terminate the exclusivity set forth in Section 7(a) at any time by providing at least one hundred twenty (120) days advance written notice of termination to Labb. Upon termination, Labb can sell the Designated Products to Competitors without any restriction and the cost per e-test sold to the Current and Future FL Franchisees will be reduced by Thirty Cents US ($0.30). No individual Franchisees of FL may terminate Section 7(a); Only FL may do so.

**8. Miscellaneous.**

(a) ***Non-assignment***. Subject to the terms of Section 5.(c) of this Agreement, FL may not assign, transfer, or sell (including by operation of law) its rights under this Agreement, or delegate its duties hereunder to any person, including, but not limited to, any affiliate or Franchisee of FL, without the prior written consent of Labb. Any purported assignment without Labb's consent shall be void and shall constitute a breach of this Agreement.

(b) ***Entire Agreement; Modification; Waiver***. This Agreement including Exhibits A – E attached hereto and incorporated herein contains the entire agreement between the Parties and may only be modified through a subsequent writing signed by both Parties. A waiver of any obligation by either Party under this Agreement shall be effective only if in writing and signed by both Parties. A waiver on one occasion shall not affect either Party's right to require strict compliance with this Agreement in the future.

(c) ***Binding upon Successors.*** All the terms and provisions of this Agreement shall be binding upon and inure to the benefit of and be enforceable by and against the approved successors, and assigns of either of the Parties.

(d) ***Terms of Service.*** The Terms of Service ("TOS") by which customers of Labb are bound are set forth at www.Labb.com and a current copy as of the Effective Date is attached hereto as Exhibit D TOS to include any amendment thereto. The provisions of, and any and all subsequent amendments to, the TOS are hereby incorporated by reference as terms of this Agreement, and FL and its Current and Future FL Franchisees agree to be bound thereby.. If there is any conflict between the terms or requirements of this Agreement and the TOS, the terms of this Agreement will prevail.

(e) ***Notices***. Labb shall send any notice required hereunder to FL or its applicable Franchisee at the address to which Labb sends invoices pursuant to this Agreement or such other address which FL specifies in a writing which is delivered to Labb. FL shall send any notice required hereunder to Labb at the following address:

James T. Ramsey
Ramsey Diagnostics Corporation
820 Port Centre Parkway
Portsmouth, VA 23704

Any notices required hereunder shall be deemed given: (i) if sent by U.S. mail, upon receipt as evidenced by a delivery confirmation receipt or (ii) if sent by recognized courier service, upon receipt as evidenced by the courier's records.

(f) ***Attorney Fees***. In the event of a default under this Agreement, the defaulting Party shall reimburse the non-defaulting Party for all costs and expenses reasonably incurred by the non-defaulting Party in connection with the default, including, without limitation, reasonable attorney fees. Additionally, in the event any suit or action is brought to enforce or interpret any of the terms of this Agreement, the judge presiding over such suit or action shall award to the Party which the judge deems to have substantially prevailed therein (in addition to, and not in lieu of, all other available legal and equitable relief) the reasonable attorney fees, costs, and expenses incurred by the Party in connection with such suit or action.

(g) ***Governing Law; Jurisdiction***. The rights of the Parties in connection with or arising under this Agreement and the relationship of the Parties whether or not arising out of this Agreement shall be governed by the laws of the Commonwealth of Virginia, excluding choice of law rules. Each Party hereby stipulates and submits to the exclusive personal jurisdiction and sole venue of the state and federal courts sitting in Norfolk, Virginia.

(h) ***Counterparts and Facsimile Signatures.*** This Agreement may be executed in multiple counterparts, none of which shall be deemed to be binding unless and until both Parties have signed this Agreement. Thereafter, each such counterpart shall be deemed an original, and all such signed counterparts together shall constitute one and the same document. Facsimile or portable document format (PDF) signatures shall be treated as original signatures for all purposes hereunder.

(i) ***Agency***. FL is an independent business and has no power, right, or authority to bind Labb or to assume or to create any obligation or responsibility, express or implied, on behalf of Labb. FL shall not take any action that could lead a third party to believe it has such authority. Nothing stated in this Agreement shall be construed as creating relationships of partners, employer and employee, franchisor and Franchisee, or principal and agent between the Parties.

(j) ***Force Majeure***. Neither Party shall be liable for any delay or default in performing its obligations (other than payment obligations) if such default or delay is caused by any event beyond the reasonable control of such Party, including, but not limited to, acts of nature, war or insurrection, civil commotion, destruction of production facilities or materials by earthquake, fire, storm

or flood, epidemic, or other similar event. The Party suffering such cause shall promptly notify the other Party of the cause and the expected duration of such cause.

(k) ***Sole Owner.*** Labb remains the sole owner of the Core Software and the Modified Software. Unless ownership of the then-current version of the Modified Software only transfers to FL pursuant to Section 5.(b) of the Agreement, nothing contained in this Agreement or the License conveyed by this Agreement gives FL or any of the Current and Future FL Franchisees any ownership or claim to ownership of the Core Software or the Modified Software nor does it give any right or imply any authorization for them to access, modify or sell the source code for the Core Software or the Modified Software. Notwithstanding what is set forth above in this Section 8.(k), all customer names, customer information and drug test results data (the "Data") that is inputted by FL or its Current and Future FL Franchisees into the Modified Software or provided directly to Labb to be used in conjunction with the Products and Services will remain the sole property of FL and may be exported from Labb by FL. Labb, however, retains the right and authority to keep a copy of all Data for its records.

(l) ***No Authority to Sell.*** The License only allows FL and its Current and Future Franchisees to use the Modified Software and any additional software developed in conjunction with the Modified Software, and any modifications thereto, during the Term. Neither FL nor any of its Current and Future Franchisees has any authority to allow any other person or entity to use or buy the Modified Software or any software to which the License applies.

**IN ACCEPTANCE, EXECUTION, AND RATIFICATION OF ALL OF THE FOREGOING, THE PARTIES, BY THEIR RESPECTIVE AUTHORIZED REPRESENTATIVES, HAVE SIGNED THIS AGREEMENT:**

**FAS-TES FRANCHISE SYSTEMS, LLC**

By: Dave Claflin ______________________

Name: Dave Claflin

Title: President of Franchise Development

**RAMSEY DIAGNOSTIC CORPORATION d/b/a LABB**

By: ______________________

Name: James Ramsey

Title: President

| | | Fastest Labs Products | | | | Fastest Labs Shipping | | Development funds |
|---|---|---|---|---|---|---|---|---|
| | | Unit price | Price | Scannable | Details | Free Shipping | Requirement | Included in Unit Price |
| | **Labb Station Software (SAAS)** | | | | | | | |
| LS-05FL1 | Special Lab Fusion Edition license - licensed facility | $99.00 | $99.00 | - | special edition | - | | - |
| LS-05FL12 | Special Lab Fusion Edition license - licensed facility (10% off for annual) | $89.10 | $1,069.20 | - | special edition | - | | - |
| LS-05FL2 | Special Lab Fusion Edition license - add-on reader | $20.00 | $20.00 | - | special edition | - | | - |
| LS-05FL12 | Special Lab Fusion Edition license - add-on reader (25% off for annual) | $15.00 | $180.00 | - | special edition | - | | - |
| | **Labb Station Hardware** | | | | | | | |
| LR-01 | Labb Station - Standard System | $420.00 | $420.00 | - | special edition | yes | none | - |
| LR-05FL1 | Labb Station - Special Lab Fusion Edition | $420.00 | $420.00 | - | special edition | yes | none | - |
| LRS-05FL1 | Special Lab Fusion Edition stand - large | $29.00 | $29.00 | - | special edition | yes | none | - |
| LRS-05FL1m | Special Lab Fusion Edition stand - small | $19.00 | $19.00 | - | special edition | yes | none | - |
| FLB-01se | Fastest Labs Badges (set - 50% off) | $11.00 | $11.00 | - | special edition | - | - | - |
| | **Labb Station Certifications** | | | | | | | |
| System certifications | Labb Station & Fastest Labs certifications | 100% off | 100% off | | Standard & special edition | - | - | - |
| Product certifications | Labb Station & Fastest Labs certifications | 100% off | 100% off | | Standard & special edition | - | - | - |
| | **UA: Series urine cup rapid drug testing kits** | | | | | | | |
| UA:06A - 25 | Rapid urine cup - AMP500/COC300/THC50/MET1000/OPI2000/PCP25 | $3.74 | $93.50 | yes | | yes | case orders | $0.50 |
| UA:10DOT | Rapid urine cup - THC50/COC150/OPI2000/HMO300/OXY100/6-AM10/PCP10/AMP500/MET500/MDMA500 | $5.01 | $125.25 | yes | Coming Soon | yes | case orders | $0.50 |
| UA:12B SVT - 25 | Rapid urine cup - AMP500/COC300/THC50/MET/1000OPI2000/PCP25/BZO300/BAR300/BUP10/MDMA500/MTD300/OXY100 | $5.03 | $125.75 | yes | | yes | case orders | $0.50 |
| UA:13B SVT - 25 | Rapid urine cup - AMP500/COC300/THC50/MET1000/OPI2000/PCP25/BZO300/BAR300/BUP10/MDMA500/MTD300/OXY100/PPX300 | $5.23 | $130.75 | yes | | yes | case orders | $0.50 |
| UA:16C SVT - 25 | AMP500/BZO300/BAR300/TRA200/COC150/MDMA150/THC50/MET500/LSD20/OPI2000/OXY100/FEN50/HMO300/6AM10/PCP25/PPX300 | $5.66 | $141.50 | yes | Coming Soon | yes | case orders | $0.50 |
| FLUA:17A SVT | AMP500/BZO300/BAR300/TRA200/COC150/MDMA150/THC50/MET500/LSD20/OPI2000/OXY100/FEN50/HMO300/6AM10/PCP25/PPX300/ K2+P | $5.81 | $145.25 | yes | Exclusive - FL branded | yes | case orders | $0.50 |
| UA:18C SVT - 25 | Rapid urine cup - AMP500/COC300/THC50/MET1000/OPI2000/PCP25/MQL300/OXY100/BZO300/BAR300/BUP10/MDMA500/MTD300/FEN50/TRA200/6-AM10/k2-10/ETG500 | $5.96 | $149.00 | yes | | yes | case orders | $0.50 |
| | **OR: Series oral fluid swab rapid drug testing kits** | | | | | | | |
| OR:06A - 25 | Rapid oral fluid swab - AMP50/COC20/THC12/MET50/OPI40/PCP10 | $4.88 | $122.00 | yes | | yes | case orders | $0.50 |
| OR:11A - 25 | Rapid oral fluid swab - AMP50/COC20/THC12/MET50/OPI40/PCP10/BZO10/BUP5/MTD30/OXY20/MDMA50 | $5.92 | $148.00 | yes | Coming Soon | yes | case orders | $0.50 |
| OR:14A - 25 | Rapid oral fluid swab - AMP50/COC20/THC12/MET50/OPI40/PCP10/BZO10/BUP5/MTD30/OXY20/MDMA50/FEN10/BAR50/ALC20 | $6.96 | $174.00 | yes | | yes | case orders | $0.50 |
| | **DI: Series urine dip card rapid drug testing kits** | | | | | | | |
| Di:ALCD - 100 | Single Alcohol (ALC) dip card - manually read | $2.00 | $200.00 | yes | Coming Soon | yes | case orders | 0.25 |
| Di: LSD - 100 | Single Lysergic acid diethylamide (LSD) dip card | $3.00 | $300.00 | yes | Coming Soon | yes | case orders | 0.25 |
| Di: HMO - 100 | Single Hydromorphone (HMO) dip card | $2.00 | $200.00 | yes | Coming Soon | yes | case orders | 0.25 |
| Di: KET - 100 | Single Ketamine (KET) dip card | $2.00 | $200.00 | yes | Coming Soon | yes | case orders | 0.25 |
| | **Confirmations: Urine** | | | | | | | |
| TOX:UA01 | UA Confirmation (Includes Validated Non-Negatives Only) | $15.00 | $15.00 | - | Option B pricing | yes | | no |
| MRO: POS | Positive Only MRO | $13.00 | $13.00 | - | Option B pricing | yes | | no |
| | **Confirmations: Oral Fluid** | | | | | | | |
| TOX:OR01 | OR Confirmation (Includes Validated Non-Negatives Only) | $22.60 | $15.00 | | Option B pricing | yes | | no |
| MRO: POS | Positive Only MRO | $13.60 | $13.00 | | Option B pricing | yes | | no |
| | **DOT/STL** | | | | | | | |
| TOX:Flex15 | Lab Test - THC/COC/AMP/OPI/MDMA/PCP/OXY/BZO/BAR/PCP/PPX/BUP/6AM/MTD/ | $14.60 | $14.60 | - | | | | maybe |
| TOX:Flex15 + MRO | Lab Test - THC/COC/AMP/OPI/MDMA/PCP/OXY/BZO/BAR/PCP/PPX/BUP/6AM/MTD/ | $17.60 | $17.60 | - | | | | maybe |
| TOX:DOT + MRO | Federal Lab Test - THC/COC/AMP/OPI/OXY/PCP/6AM/MDMA | $18.60 | $18.60 | - | | | | maybe |
| Custom Lab Fusion. UA:SPLIT labels | Collection container with temp strip, two collection vials, & specimen transport bag with absorbant material | $0.00 | $0.00 | - | | yes | | |
| OR:Single kit | Collection swab with buffer container & specimen transport bag with absorbant material - Orasure 2he or similar | $0.00 | $0.00 | - | | yes | | |

D.C.

## EXHIBIT B

## Pricing

1. **Initial Payment.** Two-hundred and Fifty Thousand Dollars ($250,000.00) to be wired by FL to Labb on the Effective Date and will cover software development costs incurred by Labb on behalf of FL.

2. **Yearly License Fee.** License for use by FL and its Current and Future Franchisees of the Modified Software and any modification made thereto (the "License Fee") for the first 365 days of the Agreement (the "First Year") will be $1,188 payable by an initial payment of $99.00 on the Effective Date and the balance being paid as follows beginning $99.00/mo and continuing throughout the Term. The License Fee will be increased yearly after the First Year at the rate set forth in Section 4 of Exhibit B for each year during the Term that this Agreement remains in effect, and each increased License Fee will continue to be paid *pro rata* over the course of the Agreement Year to which it applies.

| | | | |
|---|---|---|---|
| 2023 | $99.00 | $1,188.00 | Labb Control budget & development |
| 2024 | $102.47 | $1,229.58 | Labb Control budget & development |
| 2025 | $106.05 | $1,272.62 | Labb Control budget & development |
| 2026 | $109.76 | $1,317.16 | Labb Control budget & development |
| 2027 | $113.60 | $1,363.26 | Fastest Labs Control budget & development |
| 2028 | $117.58 | $1,410.97 | Fastest Labs Control budget & development |
| 2029 | $121.70 | $1,460.36 | Fastest Labs Control budget & development |
| 2030 | $125.96 | $1,511.47 | Fastest Labs Control budget & development |
| 2031 | $130.36 | $1,564.42 | Fastest Labs Control budget & development |
| 2032 | $134.92 | $1,619.07 | Fastest Labs Control budget & development |

3. **Agreement Year.** Each 365 day period after the First Year will be a new Agreement Year. For example, the next 365 day period after the First Year will be the "Second Year", the next 365 day period after the "Third Year", etc.

4. **Annual License Fee and Products and Services Price Increase.** Beginning on the first day of the Second Year and thereafter at the beginning of each Agreement Year during the Term, the then-current License Fee, as well as the prices for all Products and Services set forth in Exhibits A and B, will be increased by 3.5% as of the beginning of the next Agreement Year.

5. **Per Test Price Component.** During Agreement Years One through Four, the cost charged to each FL Franchisee for each e-test kit purchased will have built into its pricing Fifty Cents US ($0.50) over and above the exclusivity premium, which Labb may use toward further development and refinement of software and hardware. During Agreement Years Five through Eight, FL may direct how the proceeds of the additional Fifty Cents US ($0.50) per test kit sold to Franchisees during such



FR D.C.

period are to be used to develop or refine technology beneficial to FL. Development Fees use is outlined in Section 6 of Exhibit B.

6. **Development Fee Use.**

(a) Years One through Four. As reflected on Exhibit A, a fifty cent ($.50) per unit development fee is included in the cost of designated urine cup rapid drug testing kits and DOT/STL lab tests (the "Development Fee"). All Development Fees will be placed in a Labb account separate from other fees collected from Current and Future FL Franchisees in payment for Goods and Services. During Year One through the end of Year Four, Labb will have sole authority to determine how the Development Fees will be spent to modify, maintain, upgrade and support the Core Software, the Modified Software and to develop new software and technology. Labb will, however, consult with FL on a yearly basis to get its recommendations on uses of the Development Fees it recommends or requests. It will, however, be Labb's sole decision regarding how the Development Fees will be spent. For Year One, Labb and FL have agreed to focus on building the items set forth in Exhibit E, which is incorporated herein by reference, using the Development Fees.

(b) Years Five through Ten. Beginning at the start of Year Five and continuing through the end of Year Ten, FL as opposed to Labb, will have final approval regarding the ultimate use of the Development Fees for software development, enhancement, modification to be undertaken to benefit the use and value of the Modified Software. Labb and FL will continue to consult on a yearly basis to develop plans and usage for the Development Fees for the upcoming year. During years One through Ten of the Agreement, Labb will continue to maintain the Development Fee account and Labb will provide the development team to accomplish the yearly list of projects with payment to be made to Labb out of the Development Fee funds at the normal rates charged by the Labb development team for that type of work.

(c) All modifications, new software, processes, code, or systems developed using the Development Fees will remain the sole property of Labb.

(d) In the event the Agreement is terminated either prior to the end of Year Ten for any reason or it terminates because it is the end of Year Ten, and there is any money left in the Development Fee account that has not been spent, all such excess funds will remain the sole property of Labb and FL will not have any claim thereto. Similarly, Labb will not have any obligation to add funds to the Development Fee account beyond those amounts collected through payment of the Development Fee by Current and Future FL Franchisees.

 FR D.C.

# EXHIBIT C

## Franchisee's Agreement to be Bound
## And Payment Authorization

**(To be mutually agreed upon and executed before January 31, 2022)**

 D.C.

**EXHIBIT D**

**Terms of Service**

**(Found at https://Labb.com/TOS)**

**EXHIBIT E**

| | | |
|---|---|---|
| **2023 List** | | |
| **2023** | **Result Guard** | **Fastest Labb will be the only organization able to use the result guard technology. Result guard will be removed from all Labb result forms by March 1, 2023.** |
| **2023-3 1** | **Franchise Technology** | **Labb will not generate technology for any franchises to manage their franchisees without the express written permission of Fastest Labs** |
| **2023-2 5** | **Sub-network** | **Labb will only duplicate the Labb network system for Fastest Labs. All other clients must join the Labb or Fastest Labs network.** |
| **2023** | **Rapid Donor search via QR code or license scanning.** | **Labb will not build a rapid donor search using a scannable QR code or allowing users to scan the Donor driver's license or ID card for any other organization other than Fastest Labs.** |
| **2023** | **Special Edition Result form** | **Labb will develop a special edition result form that will be unique and exclusive to Fastest Labs** |
| **2023-2 024** | **Special Edition dashboard** | **Labb will develop a special edition dashboard that will be unique and exclusive to Fastest Labs** |



FR D.C.

# Signature Certificate

Reference number: DKKDQ-NENPB-FCQXN-GTBRL

| Signer | Timestamp | Signature |
|---|---|---|
| **Dave Claflin**<br>Email: dave@fastestlabs.com | |  |
| Sent: | 21 Dec 2022 13:48:46 UTC | |
| Viewed: | 21 Dec 2022 14:54:41 UTC | |
| Signed: | 21 Dec 2022 14:57:39 UTC | |
| **Recipient Verification:** | | IP address: 45.19.182.41 |
| ✔Email verified | 21 Dec 2022 14:54:41 UTC | Location: Boerne, United States |
| **James Ramsey**<br>Email: james@labb.com | |  |
| Sent: | 21 Dec 2022 13:48:46 UTC | |
| Viewed: | 21 Dec 2022 13:48:50 UTC | |
| Signed: | 21 Dec 2022 14:58:44 UTC | |
| | | IP address: 70.169.1.82<br>Location: Chesapeake, United States |

Document completed by all parties on:

21 Dec 2022 14:58:44 UTC



**Signed with PandaDoc**

PandaDoc is a document workflow and certified eSignature solution trusted by 30,000+ companies worldwide.