**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Norfolk Division**

**FAS-TES FRANCHISE SYSTEMS, LLC,**

*Plaintiff,*

v.

**RAMSEY DIAGNOSTICS CORP., d/b/a LABB,**

*Defendant.*

Case No. 2:26-cv-961-RBS

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

Jason C. Greaves, VSB No. 86164
Jared J. Roberts, VSB No. 97192
Katie L. Raymond, VSB No. 101624
BINNALL LAW GROUP, PLLC
717 King Street
Alexandria, Virginia 22314
Phone: (703) 888-1943
Fax: (703) 888-1930
jason@binnall.com
jared@binnall.com
katie@binnall.com

Robert M. Park (pro hac vice pending)
Chase C. Parsons (pro hac vice pending)
UHL, FITZSIMONS, BURTON, WOLFF & RANGEL, PLLC
4040 Broadway, Suite 430
San Antonio, Texas 78209
Phone: (210) 829-1660
Fax: (210) 829-1641
rpark@uhlfitzsimons.com
cparsons@uhlfitzsimons.com

*Counsel for Plaintiff*

# TABLE OF CONTENTS


TABLE OF CONTENTS ........ i

TABLE OF AUTHORITIES ........ ii

Background ........ 2

- I. The Parties and the 2022 Agreement. ........ 2
- II. Defendant's software becomes obsolete. ........ 3
- III. The fraudulent LOI and $100,000 payment. ........ 4
- IV. Defendant's inflated pricing as of September 1. ........ 6
- V. Defendant's interference with Fas-Tes's franchise relationships. ........ 7

Standard of review ........ 9

Argument ........ 10

- I. Fas-Tes is likely to succeed on the merits. ........ 10
  - a. Breach of Contract – Section 3(a) Warranty. ........ 10
  - b. Fraudulent Inducement. ........ 11
  - c. Declaratory Judgment – the LOI is unenforceable. ........ 13
    - 1. The LOI was an agreement to agree. ........ 13
    - 2. The LOI was procured by fraud. ........ 14
    - 3. Defendant's consideration was a pre-existing duty. ........ 14
- II. Fas-Tes will suffer irreparable harm without injunctive relief. ........ 15
- III. The balance of hardships tips decidedly in Fas-Tes's favor. ........ 18
- IV. Injunctive relief is in the public interest. ........ 19

Conclusion ........ 20

CERTIFICATE OF SERVICE ........ 22

# TABLE OF AUTHORITIES

## Cases

*Boisseau v. Fuller*,
96 Va. 45 (1898) ........................................ 14

*Brame v. Guarantee Finance Co.*,
139 Va. 394 (1924) ........................................ 12

*CGI Federal, Inv. v. FCi Federal, Inc.*,
94 Va. Cir. 138 (Fairfax Cnty. 2016) ........................................ 12, 13

*Cyberlock Consulting, Inc. v. Info. Experts, Inc.*,
939 F. Supp. 2d 572 (E.D. Va. 2013) ........................................ 13, 14

*Filak v. George*,
267 Va. 612 (2004) ........................................ 10

*George Robberecht Seafood, Inc. v. Maitland Bros. Co.*,
220 Va. 109 (1979) ........................................ 11

*Georgia Vocational Rehab. Agency Bus. Enter. Program v. United States*,
354 F. Supp. 3d 690 (E.D. Va. 2018) ........................................ 9, 18, 19

*Granny Goose Foods, Inc. v. Bhd. of Teamsters*,
415 U.S. 423 (1974) ........................................ 9

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bradley*,
756 F.2d 1048 (4th Cir. 1985) ........................................ 15, 16

*MultiChannel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*,
22 F.3d 546 (4th Cir. 1994) ........................................ 15

*Real Truth About Obama, Inc. v. F.E.C.*,
559 U.S. 1089 (2010) ........................................ 9

*Real Truth About Obama, Inc. v. F.E.C.*,
575 F.3d 342 (4th Cir. 2009) ........................................ 9

*Seward v. New York Life Ins. Co.*,
154 Va. 154 (1930) ........................................ 15

*Update, Inc. v. Samilow*,
311 F. Supp. 3d 784 (E.D. Va. 2018) ........................................ 15, 16, 18

*Virginia Power Energy Mktg. v. EQT Energy, LLC*,
No. 3:11-cv-630, 2012 U.S. Dist. LEXIS 98553 (E.D. Va., July 15, 2012) ............ 14

*W.J. Schafer Assocs. Inc.v Cordant, Inc.*,
254 Va. 514 (1997) ........................................................................................ 13

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008)............................................................................................ 9

Plaintiff Fas-Tes Franchise Systems, LLC “Fas-Tes”) seeks to maintain the status quo, and nothing more, between itself, its exclusive supplier of testing software and equipment—Defendant Ramsey Diagnostics, Corp., d/b/a Labb (“Defendant” or “Labb”)—and *most importantly* its franchisees, who depend on Defendant to operate their businesses. This is both a narrow and an urgent request. It is narrow in simply asking that Defendant be required to continue performing under the parties' exclusive supplier agreement which has been in effect since 2022, and to cease all non-essential communications with Fas-Tes's franchisees. It is urgent, because Defendant's withholding of exclusive services, extortive price increases, and threatening communications with Fas-Tes's franchisees is causing irreparable harm to the day-to-day operations and relationships between Fas-Tes and its franchisees.

By its own admission, Defendant has breached the agreement by failing to provide services that meet industry standards. Rather than remedy its breach, however, Defendant has embarked on an aggressive campaign to extract additional revenue from Fas-Tes and its franchisees, threatening to completely abandon the currently used software in favor of imposing new pricing that is approximately twelve times what was previously agreed.

Making matters worse, Defendant has engaged in a deliberate campaign to undermine Fas-Tes's relationship with its franchisees. Defendant has directly contacted Fas-Tes franchisees without authorization, made unsubstantiated accusations against them, and sent threatening communications to individual franchise owners. These actions and others have caused significant reputational

harm and disruption throughout the Fas-Tes franchise network. Fas-Tes and its franchisees will not even have access to Defendant's purportedly new software for months to come, thus forcing them to pay ballooned prices for something they have already paid for, and are not capable of accessing.

Without immediate injunctive relief, Defendant intends to impose inflated pricing as of September 1, 2026, while continuing to communicate directly with Fas-Tes franchisees in ways that damage Fas-Tes's business relationships. Fas-Tes respectfully requests that this Court enter a temporary restraining order and preliminary injunction to maintain the status quo by: (a) enjoining Defendant from enforcing the new pricing terms and requiring Defendant to continue operating under the 2022 Agreement's original pricing; (b) enjoining Defendant from non-essential direct contact with Fas-Tes's franchisees regarding this dispute, pricing changes, new changes to operations or testing, or exclusivity allegations; and (c) requiring Defendant to continue providing products and services under the 2022 Agreement's terms and prices with full functionality.

## BACKGROUND

### I. The Parties and the 2022 Agreement.

Fas-Tes is a franchisor headquartered in San Antonio, Texas, operating a nationwide network of franchisees that provide drug testing services to employers, individuals, and government agencies. Fas-Tes has endeavored to develop and foster excellent relations with its franchisees over the last eighteen years they have

operated. Defendant is a Virginia corporation that provides drug testing equipment, software, and related services.

On December 21, 2022, the parties executed the Exclusive Supplier and Modified Software Development Agreement (the "2022 Agreement") establishing a ten-year exclusive supplier relationship. Ex. PD-1.[1] Under the 2022 Agreement, Fas-Tes agreed to require all its current and future franchisees to purchase drug testing products and services exclusively from Defendant. Ex. PD-1, § 1(a); John Smith Decl. ("Decl.") ¶ 2. In exchange, Defendant warranted that its products would "conform to applicable industry standards for functionality and accuracy." Ex. PD-1, § 3(a); Decl. ¶ 2. Fas-Tes made a substantial initial investment in the relationship, paying $250,000 up front, and has been paying ongoing per-unit development fees to fund Defendant's software development ever since. Ex. PD-1, p. 13.

Under the 2022 Agreement, all disputes are governed by Virginia law, and venue is limited to the state and federal courts in Norfolk, Virginia. Ex. PD-1, § 8(g).

## II. Defendant's software becomes obsolete.

The core product underpinning the 2022 Agreement is the "Labb Station" drug testing platform and its associated software, "Labb Fusion." Ex. PD-1, § 7(a), p. 13. Over the life of the agreement, the drug testing industry has evolved substantially, and Labb Station has failed to keep pace. Decl. ¶ 3. Despite repeated pleas from Fas-Tes for additional industry-standard features, required by their clients and

[1] All references herein to Exhibits refer to the exhibits attached to John Smith's Declaration, which is attached and incorporated herein.

franchisees to perform day-to-day operation, Defendant has allowed the functionality and accuracy metrics of its core/modified software provided under the 2022 Agreement to fall into obsolescence. Decl. ¶ 3. Industry standard functionality that is missing from Defendant's software—and is offered by numerous competitors at competitive pricing—includes easy electronic ordering across the platform, real-time result reporting, integrated chain-of-custody management, comprehensive compliance tools, live tracking, random drug testing program management, and other insufficiencies. Decl. ¶ 5.

Critically, Defendant itself has acknowledged this obsolescence. On May 31, 2026, Defendant circulated a Proposed Partnership Framework in which it admitted that it made the "deliberate choice to abandon the original platform . . . because the industry has reached a point where incremental improvement on the existing platform could not deliver what the market needs." Ex. PD-2, p. 2; Decl. ¶ 4. Defendant further conceded that "the current agreement and the operating reality have drifted far apart" and that the "opportunity in front of [the Parties] required a platform built for the next decade, not an extension of what we built for the last one." Ex. PD-2, p. 2.

## III. The fraudulent LOI and $100,000 payment.

In June and July 2026, Defendant made serious accusations against Fas-Tes and its franchisees regarding alleged non-compliance with the exclusivity provision of the 2022 Agreement. Decl. ¶¶ 6, 9, 10. Defendant claimed that non-compliance was "widespread" and demanded that Fas-Tes enter an amendment and pay $100,000 as

a "settlement of past contract violations." Decl. ¶¶ 6, 8–10. Defendant threatened invasive investigations into Fas-Tes franchisees, which would substantially interfere with Fas-Tes's franchise relationships, unless Fas-Tes agreed to its terms. Decl. ¶ 9.

Relying on Defendant's representations, Fas-Tes proceeded in good faith and executed a letter of intent on July 6, 2026 (the "LOI"). Ex. PD-3, Decl. ¶¶ 7, 10. The LOI contemplated that the parties would "work in good faith to complete and execute a final, definitive agreement to amend the 2022 Agreement on or before July 30, 2026." Ex. PD-3, § 2.2. No such final amendment was ever completed or executed. Decl. ¶ 8.

Following execution of the LOI, Fas-Tes discovered that Defendant's representations were false, and were fabricated by Defendant's CEO. Decl. ¶ 9. By Defendant's own admission after executing the LOI, there were no significant indications of noncompliance. Ex. PD-4, p.1; Decl. ¶ 9. Upon pressing Defendant for more information of the supposed breaches of exclusivity, Defendant singled out Fas-Tes's franchisee-of-the-year, but after performing an audit, there was no breach. Ex. PD-4; Decl. ¶ 9. Fas-Tes continued to investigate and press Defendant for information about the "widespread" breaches of exclusivity, and it turned out that not only was there no evidence or valid methodology to support Defendant's allegation of "widespread" breach, but at least part of the basis for this assertion was an instruction, from Defendant's president James Ramsey, to Fas-Tes, to direct CRL testing through a third-party. Ex. PD-5, p. 7; Decl. ¶ 11. Defendant had no factual basis for the accusations that induced Fas-Tes to agree to the $100,000 payment, and

Defendant knew it at the time. *See* Decl. ¶¶ 6–11. The LOI was procured through fraud.

Moreover, there was no consideration for the LOI. The $100,000 payment was for "settlement" of violations that did not exist and were predicated upon intentional misrepresentations. *See* Decl. ¶ 6–11. And the "One by Labb" software platform that Defendant offered in return for increased prices, was a pre-existing requirement under the existing contract. Ex. PD-1, § 3(a). Under the 2022 Agreement, Defendant had warranted that it would provide "industry standard" software, which at the time included Labb Station. *Id.* One by Labb is Defendant's proposed replacement for its admittedly obsolete software, and therefore, it was already included in the 2022 Agreement. *See* Exs. PD-1, PD-2; Decl. ¶¶ 2–5.

## IV. Defendant's inflated pricing as of September 1.

Despite all of this, Defendant has insisted that the LOI is a "fully executed" amendment to the 2022 Agreement and is binding. Decl. ¶ 20. Defendant has stated its intent to charge Fas-Tes's franchisees the increased LOI prices as of September 1, 2026. Decl. ¶ 20. This new pricing—including a $249 per month SaaS license fee, up from $109, plus a revenue module fee of $150 for every $10,000 of revenue, plus various other charges—is effectively twelve (12) times the cost per the 2022 Agreement's terms. Decl. ¶ 20. The prices Defendant insists upon are incredibly inflated compared to what other–more competitive–software on the market is going for. Decl. ¶ 20.

## V. Defendant's interference with Fas-Tes's franchise relationships.

Defendant has engaged in a systematic pattern of conduct designed to undermine Fas-Tes's relationships with its franchisees. *See* Decl. ¶¶ 12–19. First, it has repeatedly made unauthorized contact with franchisees, announcing to them directly the unresolved terms of the LOI as though they were final, as well as other unagreed announcements which go beyond the LOI and the 2022 Agreement entirely. Decl. ¶ 12. Second, Defendant engaged in a smear campaign against one or more Fas-Tes franchisees concerning alleged breaches of the 2022 Agreement, thus causing reputational harm to certain franchisees and leading to yet more strained relationships between Fas-Tes and its franchisees. Decl. ¶ 13. Finally, Defendant's president directly threatened at least one top performer franchisee to engage in an aggressive audit to discover supposed breaches of exclusivity. Ex. PD-7.

Through Defendant's direct communications with Fas-Tes franchisees, Defendant has eroded the confidence and trust that multiple franchisees once had with Fas-Tes, and Fas-Tes has had to expend considerable time and energy to counteract and repair this damage. Decl. ¶ 15. This threat continues still, with new direct communications and announcements being made by Defendant, despite previous agreement with Defendant to cease such communications. Decl. ¶ 15.

Relationships in the franchise industry that are soured or lost are not easy or capable to recover. Decl. ¶ 16. Strong goodwill amongst Fas-Tes and its franchisees is the lifeblood of Fas-Tes and the loss of even one franchisee is an irreparable harm. Decl. ¶ 16. One franchisee has even decided to withhold their option to open a new

franchisee location directly because of the ongoing uncertainty and frustration caused by Defendant through its policies and direct communications with franchisees. Decl. ¶ 16.

Defendant has gone so far as to make direct announcements to Fas-Tes franchisees that they are required to use a company called Omega as the exclusive testing laboratory for all hair testing. Decl. ¶ 17; Ex. PD-6. Hair testing was never part of any agreement with Defendant, and hair testing equipment or software is not included in Exhibit A to the 2022 Agreement, which is an exhaustive list of the products and services covered by the 2022 Agreement. Decl. ¶ 17. This announcement directly undermines and usurps Fas-Tes authority as franchisor and must immediately stop. Decl. ¶ 17.

Through Defendant's communications, they imminently intend on shutting off the software currently being used by Fas-Tes and its franchisees. Decl. ¶ 18. This would result in immediate and irreparable harm to Fas-Tes and its franchisees, company-wide, because neither would be able to perform basic, day-to-day functions of their business practice without said software. Decl. ¶ 18.

Defendant's continued direct communications with Fas-Tes franchisees about non-essential business topics and unauthorized announcements pose an imminent threat of irreparable harm to Fas-Tes by eroding the goodwill cultivated between it and its franchisees—relationships that have already been greatly strained by Defendant's previous interferences. Decl. ¶ 19.

Despite multiple exchanges of letters and attempts to resolve this dispute without litigation, Defendant continues to insist that the LOI is an enforceable amendment to the 2022 Agreement, it has not addressed its multiple breaches of the 2022 Agreement, and it maintains that it will enforce the new pricing regime as of September 1, 2026. Decl. ¶ 20.

## STANDARD OF REVIEW

A temporary restraining order and preliminary injunction are governed by the same legal standard, which fall within this Court's sound discretion. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20, 32 (2008); *Georgia Vocational Rehab. Agency Bus. Enter. Program v. United States*, 354 F. Supp. 3d 690, 693 (E.D. Va. 2018). A plaintiff seeking such relief must clearly show: (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm absent injunctive relief; (3) that the balance of equities tips in the plaintiff's favor; and (4) that an injunction is in the public interest. *Id.*; *see also Real Truth About Obama, Inc. v. F.E.C.*, 575 F.3d 342, 346–47 (4th Cir. 2009), *judgment vacated on other grounds*, 559 U.S. 1089 (2010).

The purpose of a temporary restraining order is to preserve the status quo and prevent irreparable harm while the court has an opportunity to consider the merits more fully. *See Granny Goose Foods, Inc. v. Bhd. of Teamsters*, 415 U.S. 423, 439 (1974). Here, the status quo is the parties' relationship as it existed under the 2022 Agreement before Defendant attempted to impose the terms of the disputed LOI.

## ARGUMENT

### I. Fas-Tes is likely to succeed on the merits.

Fas-Tes asserts causes of action against Defendant for Breach of Contract, Declaratory Judgment, and Fraudulent Inducement, each of which independently supports a finding of likelihood of success on the merits.

#### a. Breach of Contract – Section 3(a) Warranty.

In Virginia, a breach of contract claim requires proof of: (1) a legally enforceable obligation; (2) a violation or breach of that obligation; and (3) resulting injury or damage. *Filak v. George*, 267 Va. 612, 619 (2004). Fas-Tes is likely to succeed on its breach of contract claim because it can readily establish these elements, by Defendant's own admission.

First, Defendant expressly warranted that its "Products will conform to applicable industry standards for functionality and accuracy." Ex. PD-1, § 3(a). This is an unambiguous, legally enforceable obligation.

Second, Defendant breached that warranty by its own admission. Defendant conceded in its May 2026 Proposed Partnership Framework that it made the "deliberate choice to abandon the original platform [Labb Station and Labb Fusion]" because "the industry has reached a point where incremental improvement on the existing platform could not deliver what the market needs." Ex. PD-2. Defendant's own words are an admission that its products that underpin the 2022 Agreement no longer conform to industry standards. The current Labb Station platform lacks features that are standard in the drug testing industry, including integrated chain-

of-custody management, modern electronic ordering, and comprehensive compliance tools. Decl. ¶ 5.

Third, Fas-Tes has suffered and continues to suffer injury as a result. Fas-Tes and its franchisees are bound by a ten-year, exclusive supplier agreement to use Defendant's admittedly obsolete software. Fas-Tes paid $250,000 upfront and ongoing per-unit development fees to ensure that its franchisees received a product that Defendant would continue to develop to keep pace with the market. Instead, Defendant is attempting to extract new, higher prices for the product it has developed (One by Labb) to replace their obsolete platform (Labb Station/Fusion) which was already contemplated and funded under the 2022 Agreement.

**b. Fraudulent Inducement.**

The LOI is unenforceable because—among other fatal flaws—Defendant procured it through fraudulent misrepresentation. For this reason, Fas-Tes has alleged a claim for fraudulent inducement and rescission of the contract, thereby preventing the imposition of inflated prices on Fas-Tes's franchisees, and the $100,000 payment extracted by the LOI.

Fas-Tes is likely to succeed on its fraud claim because the facts show that Defendant knowingly misrepresented its so-called evidence of "widespread" breaches of exclusivity. In Virginia, fraudulent inducement—a species of actual fraud—occurs when the defendant (1) makes an intentional and knowing misrepresentation of material fact, (2) on which the plaintiff relies to his detriment. *See George Robberecht Seafood, Inc. v. Maitland Bros. Co.*, 220 Va. 109, 111 (1979) (citing *Brame v.*

*Guarantee Finance Co.*, 139 Va. 394, 408 (1924)); *CGI Federal, Inv. v. FCi Federal, Inc.*, 94 Va. Cir. 138, 150–51 (Fairfax Cnty. 2016). A contract induced by fraud is voidable. *Id.* at 111–12.

As detailed above, Defendant misrepresented that it had evidence of widespread franchisee non-compliance with the exclusivity provisions of the 2022 Agreement. In fact, Defendant had no evidence to support its accusations. Defendant admitted that there was very little if any noncompliance and the basis for their claim of "widespread" breaches turned out to be, at least in part, an email, *sent by Defendant's president*, to the Fas-Tes franchisee network *instructing them to use another vendor to get functionality Defendant did not provide*. This is an outrageous development that demonstrates Defendant's bad faith dealing and knowing deception. Defendant cannot credibly claim to have had a basis for alleging widespread breach throughout the Fas-Tes franchisee network. Given the circumstances and Defendant's existing and acknowledged breach, Fas-Tes can clearly show that Defendant intended to mislead Fas-Tes into a disadvantageous LOI and to extract money for One by Labb that it knew was included under the 2022 Agreement.

Defendant used these fabricated allegations of breach to pressure Fas-Tes into signing the LOI and agreeing to pay an additional $100,000 as "settlement." This was a material misrepresentation, as Fas-Tes would not have entered the LOI, much less agreed to pay $100,000, if it had known the truth. Because Defendant did not have evidence of widespread—or even discrete—breaches of exclusivity, it was aware that

the representations were false. Moreover, Defendant was aware (as it had previously conceded in writing) that Defendant was already in breach of the warranty provision of the 2022 Agreement, and therefore this fabrication was intended to pressure Fas-Tes into a modification of that contract. Fas-Tes relied in good faith upon Defendant's representations in agreeing to the LOI.

**c. Declaratory Judgment – the LOI is unenforceable.**

Fas-Tes is entitled to a declaratory judgment that the LOI is unenforceable for multiple, independent reasons: it was an agreement to agree, it was procured through fraud, and Defendant's supposed consideration was a pre-existing duty. Fas-Tes is likely to succeed on any of these issues.

***1. The LOI was an agreement to agree.***

First, the LOI was an agreement to agree that was never finalized. The LOI expressly contemplated that the parties would "work in good faith to complete and execute a final, definitive agreement to amend the 2022 Agreement on or before July 30, 2026." Ex. PD-3. The July 30 deadline passed without any final amendment being completed or executed.

In Virginia, an agreement to agree is unenforceable. *See W.J. Schafer Assocs., Inc. v Cordant, Inc.*, 254 Va. 514, 520 (1997) (mere "agreements to agree in the future" are "too vague and too indefinite to be enforced"). Similarly, an agreement to negotiate in good faith, is not a valid contract. *See CGI Federal*, 94 Va. Cir. at 145–46 (citing *Cyberlock Consulting, Inc. v. Info. Experts, Inc.*, 939 F. Supp. 2d 572, 578–79 (E.D. Va. 2013)). "In Virginia, any writing in which the terms of a future

transaction or later, more formal agreement are set out is presumed to be an agreement to agree rather than a binding contract." *Cyberlock*, 939 F. Supp. 2d at 580 (quoting *Virginia Power Energy Mktg. v. EQT Energy, LLC*, No. 3:11-cv-630, 2012 U.S. Dist. LEXIS 98553, *12 (E.D. Va., July 15, 2012)). "[E]ven if the parties are fully agreed on the terms of their contract, the circumstance that the parties do intend a formal contract to be drawn up is strong evidence to show that they did not intend the previous negotiations to amount to an agreement which is binding." *Id.* at 581 (quoting *Boisseau v. Fuller*, 96 Va. 45, 46–47 (1898)).

In this case, the LOI contained express language that contemplated a formal, future agreement to amend the 2022 Agreement. It is therefore presumed to be an agreement to agree. Even if Defendant points to specific terms in the LOI, like pricing, to argue that it was a binding agreement, Fas-Tes is still likely to succeed on this issue because, as noted by this District in *Cyberlock*, the express intention to negotiate in good faith for a final amendment is "strong evidence" that the LOI is unenforceable. *See id.*

***2. The LOI was procured by fraud.***

Even ignoring the fatal flaw of the LOI being an agreement to agree, it would be unenforceable because it was procured by fraud and is voidable, as discussed above.

***3. Defendant's consideration was a pre-existing duty.***

Under the LOI, Defendant purports to provide a new software platform, One by Labb, as consideration for inflated new pricing. One by Labb, however, is merely

a modification or development of the software that Fas-Tes and its franchisees had already paid for (and were continuing to pay for) under the 2022 Agreement, and which Defendant was already contractually obligated to provide.

In Virginia, a party's promise to do something they are already legally bound to do by an existing contract is not valid consideration to support a new contract or modification. *Seward v. New York Life Ins. Co.*, 154 Va. 154, 168 (1930) ("[A] new promise, without other consideration than the performance of an existing contract in accordance with its terms, is a naked promise without legal consideration therefor and unenforceable.").

There can be no reasonable dispute on this point. Defendant announced that it was retiring the software provided under the 2022 Agreement in favor of One by Labb. Therefore, under the warranty provision of the contract, Defendant was required to provide One by Labb as a replacement. To interpret this in any other way is an absurdity, because of the exclusivity provisions of the contract and the ongoing development fees Fas-Tes and its franchisees were paying.

## II. Fas-Tes will suffer irreparable harm without injunctive relief.

Absent a temporary restraining order, Fas-Tes will suffer irreparable harm to its reputation and its business relationships with its franchisees, as well as unascertainable loss of profits from franchisees being unable to compete. "Generally, irreparable harm 'is suffered when monetary damages are difficult to ascertain or are inadequate.'" *Update, Inc. v. Samilow*, 311 F. Supp. 3d 784, 795 (E.D. Va. 2018) (quoting *MultiChannel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*,

22 F.3d 546, 551 (4th Cir. 1994)). The Fourth Circuit recognizes that the threat of harm to ongoing business relationships, reputational injury, loss of customers, and loss of goodwill support a finding of irreparable harm. *See MultiChannel*, 22 F.3d at 552; *Merrell Lynch, Pierce, Fenner & Smith, Inc. v. Bradley*, 756 F.2d 1048, 1054 (4th Cir. 1985).

In *Update, Inc.*, this District found that evidence of diversion of customers by the defendant constituted irreparable harm that was neither remote, nor speculative. *Update, Inc.*, 311 F. Supp. 3d at 796. The court reasoned that even though the damage done by the loss of an isolated customer or deal could be calculated, the potential, future loss of business opportunities was sufficiently difficult to ascertain. *Id.*

Similarly, in *Merrill Lynch*, this District granted a preliminary injunction to prevent the defendant from soliciting the plaintiff's clients pending resolution of arbitration. *Merrill Lynch*, 756 F.2d at 1050. The Fourth Circuit affirmed the decision, noting that plaintiff "faced irreparable, noncompensable harm in the loss of its customers" that would be impossible to ascertain with any accuracy. *Id.* at 1055.

Fas-Tes faces multiple categories of irreparable, imminent harm. First, Defendant's actions, as the exclusive supplier to Fas-Tes of lab test equipment and software, causes network-wide franchise system disruption. By imposing the LOI's inflated pricing as of September 1, every franchise in the system is simultaneously impacted. The cascading effects throughout the network—where franchise confidence, system uniformity, and brand reputation are intertwined—are inherently difficult to quantify and cannot be remedied by money damages.

Second, Fas-Tes faces reputational harm in its business relationships and reputation of trust with its franchisees—relationships that have been built over the course of eighteen years with franchisees across the country. Fas-Tes franchisees are small businesses, locally owned and operated. They rely on Fas-Tes to ensure they can provide industry-leading drug, alcohol, and DNA testing services to compete in a crowded marketplace. They rely on Fas-Tes to build and maintain the reputation and goodwill of the franchise brand. They rely on Fas-Tes to choose appropriate, quality vendors and—with its nationwide network and greater leverage—to negotiate fair pricing with those vendors. Defendant's actions—including announcement to franchisees of inflated LOI pricing terms, making uncorroborated accusations, and sending threatening messages—have already caused significant damage to the trust between Fas-Tes and its franchisees. That harm is ongoing and will be compounded if Defendant continues to contact franchisees directly and otherwise undermine Fas-Tes.

Third, Fas-Tes faces the real risk of losing franchisees. If Defendant is allowed to impose the inflated LOI pricing—twelve times what they could get elsewhere—and continues to disrupt the Fas-Tes franchise relationships, the franchisees can and will leave the network. One franchisee has already elected not to open a second location because of Defendant's actions. Each lost franchisee represents not just a loss of revenue, but a diminution of the franchise network's value as a whole—harm that is difficult to estimate and thus irreparable.

Fourth, Defendant's imminent retiring of software without providing a replacement under the 2022 Agreement is a disruption of the Fas-Tes franchisees' core business operations. Without continued functionality of the software provided by Defendant, whether the original Labb Station, or the new One by Labb, Fas-Tes and its franchisees face the threat of being unable to perform day-to-day operations. This directly impairs their ability to serve customers and will generate ongoing business losses that are difficult to track across the entire network. Just like the cases of non-compete agreements, *Merrill Lynch* and *Update, Inc.*, it is impossible to calculate Fas-Tes's loss of profits and goodwill from customers who will not return and will choose other labs for their testing needs.

## III. The balance of hardships tips decidedly in Fas-Tes's favor.

Because Fas-Tes seeks only to maintain the status quo—to enforce the terms of a ten-year agreement the parties have been operating under for the past four years—injunctive relief causes no prejudice to defendant. *See Georgia Vocational*, 354 F. Supp. at 701 (finding that maintenance of the status quo favored the plaintiff). Conversely, to allow Defendant to continue insisting upon exclusivity, while ignoring its own breach of the 2022 Agreement, and imposing the draconian terms of the LOI during the pendency of this litigation, will cause irreparable harm to Fas-Tes's franchisee relationships and to its goodwill and profitability, as detailed above. Fas-Tes has a valid interest in preserving and protecting its franchisees and their reputation for providing industry-leading lab testing services during the pendency of this case. Defendant has no valid interest in obtaining the benefits of a fraudulently

procured and non-finalized LOI. Therefore, the balance of interests is decidedly in favor of Fas-Tes.

## IV. Injunctive relief is in the public interest.

Similarly, the requested injunctive relief is in the public interest because "the public has an interest in protecting the legitimate expectations of parties to a contract." *See Update, Inc.*, 311 F. Supp. 3d at 796. In this case, the injunction serves to protect not just the rights of Fas-Tes, but the rights of franchisees across the country in the Fas-Tes network, each one a small business that will be devastated by Defendant's actions.

In *Update, Inc.*, the court noted that even for noncompete agreements, which are disfavored in Virginia as against public policy, and even though enforcement potentially impaired the defendant's ability to earn a living, the public interest in upholding valid non-competes was sufficiently in the public interest to issue the preliminary injunction. *Id.*

In *Georgia Vocational*, the court granted a temporary restraining order, finding that the public interest test was met, even though the plaintiff sought to bind the U.S. Government to a contract beyond its expiration date. *Georgia Vocational*, 354 F. Supp. 3d at 701.

In this case, there is a valid public interest in protecting Fas-Tes's franchisees, which are small, locally owned businesses, from Defendant's predatory and fraudulent price gouging for a product and service it was supposed to be providing under the 2022 Agreement. Moreover, Fas-Tes is not seeking to bind Defendant to a

contract beyond its expiration. To the contrary, the 2022 Agreement has a ten-year term, and is valid until 2032. Therefore, the public interest decidedly favors the requested injunctive relief.

## CONCLUSION

This is a classic case where maintenance of the status quo decidedly meets all the required criteria. Not only does a temporary restraining order and preliminary injunction protect Fas-Tes from irreparable harm, but protects the wider franchisee network of independent, small businesses, from continued harm. And there is no prejudice or harm to Defendant, because all they are required to do is abide by the terms of a mutually agreed contract with six years remaining on the term. Because of this, and because Fas-Tes is likely to succeed in the underlying action, Fas-Tes respectfully requests that this Court enter a Temporary Restraining Order and Preliminary Injunction:

(a) Enjoining Defendant from enforcing the LOI's pricing terms and requiring Defendant to continue operating under the pricing established by the 2022 Agreement;

(b) Enjoining Defendant from non-essential direct contact with Fas-Tes franchisees regarding this dispute, pricing changes, or exclusivity allegations; and

(c) Requiring Defendant to continue providing products and services under the 2022 Agreement's terms, with full functionality.

Fas-Tes further requests such other and further relief as this Court deems just and proper.

Dated: September 18, 2026

Respectfully submitted,

*/s/ Jason C. Greaves*

Jason C. Greaves, VSB No. 86164
Jared J. Roberts, VSB No. 97192
Katie L. Raymond, VSB No 101624
BINNALL LAW GROUP, PLLC
717 King Street
Alexandria, Virginia 22314
Phone: (703) 888-1943
Fax: (703) 888-1930
Email: jason@binnall.com
jared@binnall.com
katie@binnall.com

Robert M. Park (pro hac vice pending)
Chase C. Parsons (pro hac vice pending)
UHL, FITZSIMONS, BURTON, WOLFF & RANGEL, PLLC
4040 Broadway, Suite 430
San Antonio, Texas 78209
Phone: (210) 829-1660
Fax: (210) 829-1641
Email: rpark@uhlfitzsimons.com
cparsons@uhlfitzsimons.com

*Counsel for Plaintiff*

**CERTIFICATE OF SERVICE AND NOTICE**

I certify that on September 18, 2026, a copy of the foregoing was filed with the Clerk of the Court using the Court's CM/ECF system, which will send notice of the filing to all counsel of record who are registered with CM/ECF.

I further certify that I have provided notice to Defendant of the requested emergency relief and emailed a copy of the foregoing to:

Todd D. Rothlisberger, Esq.
trothlisberger@pbp-attorneys.com

*Counsel for Defendant*
*Ramsay Diagnostics Corp., d/b/a Labb*

*/s/ Jason C. Greaves*

Jason C. Greaves, VSB No. 86164
Jared J. Roberts, VSB No. 97192
Katie L. Raymond, VSB No 101624
BINNALL LAW GROUP, PLLC
717 King Street
Alexandria, Virginia 22314
Phone: (703) 888-1943
Fax: (703) 888-1930
Email: jason@binnall.com
jared@binnall.com
katie@binnall.com

*Counsel for Plaintiff*