**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**NORFOLK DIVISION**

**FAS-TES FRANCHISE SYSTEMS, LLC,**

***Plaintiff,***

v. Case No. 2:26-cv-961

**RAMSEY DIAGNOSTICS CORP., d/b/a LABB,**

***Defendant.***

**DEFENDANT'S MEMORANDUM IN IN OPPOSITION TO PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

Now comes Defendant Ramsey Diagnostics Corp. d/b/a Labb ("Defendant"), by counsel, and files its Memorandum in Opposition to Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction (Dkt. No. 8) as follows:

**FACTS IN RESPONSE TO DECLARATION OF JOHN SMITH**

Defendant avers the following facts in response to the Declaration of John Smith (Dkt. No. 8-1), which are supported by the Declarations of James Ramsey and Jefferey Konecke attached hereto as Exhibits A and B respectively:

1. Defendant and Plaintiff have had a working relationship since 2019, when they entered an agreement on August 24, 2019 (the "2019 Agreement"). The 2019 Agreement was terminated by Defendant. The December 21, 2022 agreement titled "Exclusive Supplier and Modified Software Development Agreement" (the "Agreement") was then negotiated and entered into by the parties. (Ramsey Decl. ¶¶ 5-6.)
2. Plaintiff advertises the Defendant software currently used by the franchisees is "Advanced, cutting-edge technology" and "State-of-the-art testing equipment." (Ramsey Decl. ¶¶ 8.)

3. Before Defendant served its notice of breach and demand to cure on August 11, 2026, Plaintiff never once sent Defendant a notice of breach of warranty or asserted any claim that the software failed to meet the Agreement's requirements. (Ramsey Decl. ¶ 9.)

4. Since entering the Agreement, Defendant has spent thousands of hours updating and improving the current software. (Ramsey Decl. ¶¶ 10-11.)

5. Defendant built an entirely new platform, One by Labb, on new core technology. (Ramsey Decl. ¶ 11.)

6. Defendant's current products and services, including the Core and Modified Software, meet the industry standard. (Ramsey Decl. ¶¶ 12-13.)

7. One by Labb is a new software platform which has additional tools and features franchisees currently purchase from other vendors. (Ramsey Decl. ¶¶ 15-16.)

8. The Agreement allows franchisees the ability to use third party labs in limited circumstances and only after pre-approval to do so is obtained. No franchisee requested pre-approval. Plaintiff instructed at least one franchisee owner, Marvin Spears, to use a third-party, not the other way around as alleged by Plaintiff. (Ramsey Decl. ¶¶ 19-23.)

9. Defendant has legitimate business reasons to communicate with the franchisees. The franchisees are Defendant's customers. The Agreement does not require Defendant to obtain approval from Plaintiff before it communicates with the franchisees or provides them additional products and services. Plaintiff has been aware of and encouraged contact between the franchisees and Defendant. Franchisees regularly contact Defendant on their own initiative, including to request Defendant's help responding to requests for proposals, and franchisees have continued to enroll in the Channel Partner Program

("CPP"), an additional, optional service for which franchisees contract directly with Defendant. (Ramsey Decl. ¶¶ 24-28.)

10. The communications between Defendant and franchisees identified in the Smith Declaration PD-6 and PD-8, were legitimate business communications for additional, optional products or services Defendant was offering to franchisees. Defendant's communications announced new products, discounts, or sales and marketing support that franchisees could accept or decline. (Ramsey Decl. ¶¶ 29-31.)
11. Defendant and Plaintiff agreed upon and executed the Amendment on July 6, 2026. (Konecke Decl. ¶ 7.)
12. Plaintiff recognized the Amendment as an amendment to the parties 2022 Agreement. (Konecke Decl. ¶ 8.)
13. The Amendment contains three sections: 1) "Franchise Fee Announcement and Structure"; 2) "Term Sheet and Definitive Agreement"; 3) "Settlement of Past Contract Violations"; and 4) Effect of Amendment; General." (Dkt. No. 8-4);
14. Section 1 of the Amendment requires Plaintiff to announce the new fee structure to all franchisees, sets the fees, specifies the new fees apply no matter which software platform the franchisees use, and makes the new fees effective September 1, 2026. (Dkt. No. 8-4); (Konecke Decl. ¶ 9).
15. Section 1 of the Amendment was contingent upon neither completion of a term sheet and definitive agreement nor receiving the payment in exchange for settling past contract violations. (Konecke Decl. ¶¶ 10-11).
16. The new pricing in the Amendment was not in exchange for the franchisees to use One by Labb. (Dkt. No. 8-4) (Konecke Decl. ¶ 11).

17. Plaintiff claims Defendant improperly announced the fee change from the Amendment to the franchisees. However, Plaintiff, as required by the amendment, announced the new fees to the franchisees on July 7, 2026. (Konecke Decl. ¶¶ 11-15.)
18. The parties negotiated the Amendment over the course of at least two months. (Konecke Decl. ¶¶ 17-18.)
19. After the Amendment was signed, the parties continued to negotiate the term sheet and definitive agreement as contemplated by Section 2 of the Amendment. (Konecke Decl. ¶19.)
20. Although Plaintiff eventually repudiated the Amendment, Laab has and intends to continue operating under the 2022 Agreement as amended by the Amendment. (Konecke Decl. ¶ 16.)
21. Defendant has not threatened to turn off or stop supporting Labb Station and Lab Fusion. The only discussions to eventually, at an unknown point in the future, were theoretical if the parties reached an agreement on the term sheet and the definitive agreement. Moreover, Labb Station and Lab Fusion would only be retired after all franchisees had migrated to another platform, so there would be no interruption in service. (Konecke Decl. ¶ 20.)
22. Since no new term sheet or definitive agreement were agreed upon, any discussion of ending the current platforms has ceased. (Konecke Decl. ¶ 20.)
23. The only feature of Lab Fusion which was turned off was the Direct Read function, which was done with the agreement of Plaintiff. Disabling Direct Read was announced on July 13, 2026 jointly by Plaintiff and Defendant, and since that time the feature has been restored for most franchisee locations. (Konecke Decl. ¶ 21.)

24. Prior to the execution of the Amendment, Plaintiff had knowledge of breaches by the franchisees of the exclusivity provision and communicated with its own franchisees regarding their use of non-Labb vendors, which is a breach of the exclusivity provisions of the Agreement. (Konecke Decl. ¶¶ 23-25.)

25. Plaintiff had been aware of exclusivity breaches by its franchisees, and the parties were working towards a resolution of past breaches. (Konecke ¶23-25.)

26. During the negotiation of the Amendment, Defendant offered multiple different options for pricing structure and settlement of past claims. (Konecke ¶¶ 27-28.)

27. After the Amendment was signed, Defendant continued to provide Plaintiff with evidence of exclusivity breaches. (Konecke Decl. ¶ 29.)

28. Plaintiff asserts it was misled regarding the extent of exclusivity breaches based upon select statements from a handful of emails. However, the entirety of the communications between the parties shows Defendant had reason to claim the breaches had and were taking place. (Konecke ¶ 33-37.)

29. Defendant eventually ended much if not all of its investigation into exclusivity breaches because the parties had entered the Amendment, which in part, resolved those breaches. Also, establishing breaches system wide would take three months or more. (Konecke Decl. ¶ 34.)

30. Defendant has evidence of exclusivity breaches by franchisees, including reconciliation of rapid test kit purchases against tests recorded in Defendant's platform and from conversations with franchisees. However, Defendant does not have access to all records necessary to perform a complete audit to confirm all exclusivity breaches by franchisees. (Ramsey Decl. ¶¶ 17-18.)

31. Plaintiff was responsible under the Agreement to conduct an audit when notified of an exclusivity breach, because Plaintiff is the only party with full access to the relevant data. Defendant requested just such an audit on August 11, 2026. However, Plaintiff unilaterally decided an audit was not warranted or reasonable. (Konecke Decl. ¶ 37.) (Ramsey Decl. ¶ 17.)

32. Defendant's communications with the franchisees concerning the Amendment, pricing, or exclusivity were issued jointly with Plaintiff or with Plaintiff's advanced agreement. (Konecke Decl. ¶¶ 38-39.)

33. Defendant communicates with franchisees for many legitimate, ordinary business reasons, as it has since 2022 on several topics as detailed in the Konecke Declaration. (Konecke Decl. ¶ 40.)

34. Plaintiff has not requested Defendant to cease communications with franchisees prior to this litigation and Defendant has not agreed to cease communications with the franchisees. (Konecke Decl. ¶ 42.)

35. Any confusion with franchisees concerning the Amendment or the new pricing has been created by communications from Plaintiff claiming the new fees were unauthorized and instructed franchisees not to pay fees. (Konecke Decl. ¶ 43.) (Ramsey Decl. ¶¶ 37-39.)

36. Plaintiff sent its franchisees a notice about the new fees required by the Amendment on July 9, 2026. Three weeks later Plaintiff sent a conflicting notice with an instruction not to pay. On September 1, 2026, during the cure period, Plaintiff told its owners that the new rates had never been agreed to and instructed them not to sign anything from Defendant reflecting the new terms. (Ramsey Decl. ¶ 39.)

37. Defendant has not and does not intend to imminently shut off the software franchisees currently use. Defendant has no plan to terminate Labb Station or Lab Fusion through the end of the Agreement term, which ends in approximately six years. Defendant will continue to maintain and support the current system to under the Agreement. Defendant has repeatedly kept franchisees on the platform even after serious Terms of Service violations. (Konecke Decl. ¶ 44.) (Ramsey Decl. ¶¶ 34-35.)

38. Defendant is permitted to offer hair testing under the terms of the Agreement, which Defendant began offering, but not requiring, through Omega on September 1, 2026, saving franchisees on hair testing prices by up to 80%. (Ramsey Decl. ¶29.)

## ARGUMENT

### I. Introduction.

Plaintiff seeks to transform a commercial dispute between sophisticated contracting parties into claims for breach of contract, fraud, rescission, declaratory relief, restitution, and injunctive remedies. Plaintiff now seeks a Temporary Restraining Order and a Preliminary Injunction in this matter asking this Court to:

a. Enjoin Defendant from enforcing the valid Amendment and continue operating under the pricing of the Agreement without the modified prices in the Amendment;

b. Enjoin Defendant from alleged non-essential contact and communication with the franchisees; and

c. Require Defendant to continue providing products and services under the Agreement. In other words, enjoin Defendant from terminating access to the software currently being used by the franchisees;

Plaintiff asserts (1) Defendant allegedly failed to provide software meeting Plaintiff's expectations, (2) Defendant implemented a fee structure contained in a written amendment[1] executed by both parties, and (3) Plaintiff later became dissatisfied with that amendment and now seeks to avoid it. None of these allegations state a plausible claim for relief under federal pleading standards, and Defendant intends to timely file a Motion to Dismiss pursuant to FRCP R. 12(b)(6) seeking to dismiss all claims. This alone is reason enough to deny the TRO and Preliminary Injunction.

Additionally, Plaintiff's concerns do not warrant a Temporary Restraining Order or Preliminary Injunction. The new pricing established by the Amendment is enforceable. However, even if the court eventually found it was not enforceable, Plaintiff has a valid remedy at law and can seek monetary damages. Plaintiff's claims of improper communications between Defendant and the franchisees are unsupported by the record. Plaintiff's baseless claims of an imminent threat of Defendant shutting down access to the existing software by franchisees is not supported by the record.

## II. Temporary restraining order and perliminary injunction standard of review.

Both a temporary restraining order and preliminary injunction constitute extraordinary remedies that may be awarded only upon a clear showing that the movant is entitled to such relief. *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 22 (2008). To obtain preliminary injunctive relief, the movant must establish: (1) that it is likely to succeed on the merits, (2) that it is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in its favor, and (4) that an injunction is in the public interest. *Id.* at

[1] Plaintiff attached the parties' fully executed "Amendment No. 1 to the Exclusive Supplier and Modified Software Development Agreement" (Dkt. No. 1-3) to the Complaint. Plaintiff falsely calls the executed amendment a "letter of intent."

20; *The Real Truth About Obama, Inc. v. FEC*, 575 F.3d 342, 346-47 (4th Cir. 2009) (vacated on other grounds, 559 U.S. 1089 (2010); reissued in relevant part, 607 F.3d 355 (4th Cir. 2010)). "[A] preliminary injunction can be granted only if every factor is met, {y]et denying a preliminary injunction only takes the rejection of a single factor." *AFT v. Bessent*, 152 F.4th 162, 169 (4th Cir. 2025) The court must also consider whether there is any other adequate remedy available to the Plaintiff. *Our Co. v. Eagle Snacks, Inc.*, 812 F. Supp. 6, 7 (D. Me. 1993) (analyzing temporary restraining order request finding "if money damages are adequate for the threatened loss, there is no irreparable harm to the plaintiff.")

**III. Plaintiff has not set forth sufficient facts showing it is likely to succeed on the merits.**

Plaintiff asserted three causes of action, all of which are subject to a potential Rule 12(b)(6) motion to dismiss. The written agreements between the parties, which were attached to the Complaint, defeat the claims Plaintiff attempts to assert.

To survive a Rule 12(b)(6) motion, a complaint must contain sufficient factual allegations to "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. Courts need not accept legal conclusions couched as factual allegations. *Iqbal*, 556 U.S. at 678. "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.*

Where a complaint relies upon written contracts attached as exhibits, the Court may consider those documents, and the documents control over contrary allegations. *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 165-67 (4th Cir. 2016) ("the exhibit prevails in the event of a conflict between an attached exhibit and the allegations of a complaint"). Similarly, the court may also consider "a document submitted by the movant that was not attached to or expressly

incorporated in a complaint, so long as the document was integral to the complaint and there is no dispute about the document's authenticity." *Id.* at 166.

For causes of action asserting fraud, the plaintiff must satisfy the heightened pleading requirements of Rule 9(b), requiring a plaintiff to plead the "time, place, and contents" of the alleged misrepresentation, as well as the identity of the speaker and what was obtained thereby. *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 784 (4th Cir. 1999). These heightened pleading standards serve at least four purposes:

> First, the rule ensures that the defendant has sufficient information to formulate a defense by putting it on notice of the conduct complained of. … Second, Rule 9(b) exists to protect defendants from frivolous suits. A third reason for the rule is to eliminate fraud actions in which all the facts are learned after discovery. Finally, Rule 9(b) protects defendants from harm to their goodwill and reputation.

*Id.*

**A. Count I fails to state a claim for breach of contract.**

Under Virginia law, a plaintiff asserting breach of contract must allege: 1) a legally enforceable obligation; 2) defendant's breach; and 3) resulting damages. *Filak v. George*, 267 Va. 612, 619 (2004). Plaintiff identifies an agreement, but it fails plausibly to allege any actionable breach.

The Complaint does not identify a specific contractual provision requiring the software capabilities Plaintiff demands. Plaintiff alleges Defendant's software does not include certain features Plaintiff considers "industry standard" and cannot accommodate all third-party collection sites. (Dkt. No. 1 ¶¶ 15-16.) The Complaint does not identify what industry standards were not met, and the Agreement contains no provision requiring compatibility with third-party collection vendors, non-Labb equipment, or every operational preference of Plaintiff's

franchisees. The Complaint merely asserts that such features should exist without any factual basis.

The Complaint never identifies contractual language requiring: 1) compatibility with non-Labb cups; 2) compatibility with third-party collection software; 3) accommodation of any specific operational model alleged by Plaintiff. Accordingly, Count I fails to plead breach of a specific contractual obligation.

The express terms of the Agreement refute Plaintiff's claim One by Labb must be provided under the parties' existing agreement. Plaintiff alleges One by Labb necessarily constitutes software that Defendant was already obligated to license. (Dkt. No. 1-2 ¶ 19.) Until the end of the term, the Agreement expressly provides that Defendant remains the sole owner of both the Core Software and Modified Software (Dkt. No. 1-2 at 13) and that any development or new software developed using the development fees remain Defendant's sole property (Doc 1-2 at 16). The Agreement further grants Defendant authority during Years One through Four to determine how development funds are spent and what technology is developed. *Id.* The Agreement does not require Defendant to provide every future software platform it develops. Plaintiff's assertion that One by Labb automatically falls within existing licensing rights is a conclusion unsupported by contractual text and insufficient under *Iqbal*.

Plaintiff cannot validly assert One by Labb automatically falls within the gambit of Modified Software. The term Modified Software is defined in the contract as software created by Defendant to be developed at an unspecified future date that would be "a specialized adaptation of the Core Software with additional unique and proprietary software, source code, and inferencing engine in order to address the specific needs of FL." (Dkt. No. 1-2 at 1.) The Complaint fails to allege Defendant breached the agreement by failing to develop or provide the

Modified Software. Similarly, the Complaint fails to allege facts supporting the conclusion One by Labb was modified software. There are no facts alleged supporting the proposition One by Labb was developed to "address the specific needs of FL" or what those needs included. Rather, the allegations establish One by Labb is something else. Plaintiff does not, because it cannot, directly allege One by Labb was Modified Software. At most they allege One by Labb was "developed in conjunction with the Modified Software." (Dkt. No. 1 ¶ 19.) Something developed in conjunction with the Modified Software is not the Modified Software. Plaintiff does not identify any relevant contract provision whereby Defendant is obligated to provide access to every product or service developed by Defendant in conjunction with the Core Software or the Modified software.

**B. Count I as alleged is barred by the Agreement's exclusive-remedy provisions.**

The Agreement contains comprehensive warranty and limitation-of-liability provisions. Section 3(c) provides the exclusive remedies for nonconforming products and services: 1) replacement; 2) reperformance; 3) refund; or 4) credit. Section 3(d) further provides these remedies are the "sole and exclusive remedy" and expressly excludes lost profits, consequential damages, and other special damages. That section, in all caps states:

(d) ***Limitation of Section 3 Remedies and Liability***. FL'S AND EACH OF THE CURRENT AND FUTURE FL FRANCHISEES' SOLE AND EXCLUSIVE REMEDY FOR DEFECTIVE PRODUCTS AND/OR SERVICES SHALL BE REFUND, CREDIT, OR REPLACEMENT/RE-PERFORMANCE AS PROVIDED HEREINABOVE IN SECTION 3.(c). IN NO EVENT SHALL LABB BE LIABLE FOR THE COST OF PROCUREMENT OF SUBSTITUTE PRODUCTS OR SERVICES, LOSS OF PROFITS, OR ANY OTHER SPECIAL, PUNITIVE, CONSEQUENTIAL, OR INCIDENTAL DAMAGES, HOWEVER CAUSED, EVEN IF LABB HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. IF A COURT OF COMPETENT JURISDICTION FINDS THE FOREGOING LIMITATION INAPPLICABLE, UNENFORCEABLE OR UNLAWFUL FOR ANY REASON, THEN LABB'S LIABILITY TO FL AND/OR TO ANY OF THE CURRENT AND FUTURE FL FRANCHISEES FOR ANY CAUSE OF ACTION ARISING UNDER THIS AGREEMENT, SPECIFICALLY INCLUDING, BUT NOT LIMITED TO, BREACH OF WARRANTY SHALL NOT EXCEED THE RESPECTIVE TOTAL MONETARY AMOUNT WHICH THE AFFECTED FRANCHISEE INDIVIDUALLY AND SEVERALLY PAID TO LABB PURSUANT TO THIS AGREEMENT DURING THE SIX (6) MONTHS IMMEDIATELY PRECEDING THE DATE SUCH CAUSE OF ACTION AROSE.

Under the common law, Virginia courts have long enforced negotiated limitation of remedies clauses. *See e.g., C. E. Wright & Co. v. Shackleford*, 152 Va. 635, 648, 148 S.E. 807, 811 (1929). The Uniform Commercial Code also recognizes the enforceability to damage limitation or exclusion clauses like the one here. Va. Code § 8.2-719. The annotations to this statute makes it clear, "parties are left free to shape their remedies to their particular requirements and reasonable agreements limiting or modifying remedies are to be given effect."

Plaintiff seeks damages exceeding $533,000, declaratory relief excusing future obligations, restitution, and other relief not authorized by the contract. The Agreement expressly forecloses such damages and remedies. Accordingly, Count I should be dismissed.

Plaintiff's allegations of damages are speculative and conclusory. The Complaint asserts damages of "at least $533,010" but provides no factual basis for the calculation. Under *Twombly and Iqbal*, damages, like other necessary elements, must be plausibly alleged, and cannot be pled through bare conclusory statements devoid of supporting facts. The Complaint contains no calculation, identification of lost contracts, description of lost customers, or explanation of the asserted amount. Therefore, the damage allegations are insufficient.

### C. Count II Fails to State a Claim for Fraudulent Inducement

Count II independently fails for several reasons. First, the Complaint does not satisfy Rule 9(b). Fraud must be pled with particularity under Rule 9(b). The Fourth Circuit requires a plaintiff to plead who made the statement, what was said, when it was said, where it was said, and why it was false. *Harrison*, 176 F.3d at 784. The Complaint generally alleges Defendant represented some franchisees had breached exclusivity provisions. (Dkt. No. 1 at 10.) It does not allege any of the facts required by *Harrison*, and the lack of such allegations fails to satisfy Rule 9(b).

Second, Plaintiff alleges only future contractual negotiations, not actionable fraud. Virginia law distinguishes actionable fraud from statements regarding future contractual performance. Plaintiff alleges Defendant concocted exclusivity violations by franchisees and used the threat of enforcement to negotiate the Amendment. (Dkt. No. 1 at 9-11.) Plaintiff goes on to allege Defendant's threat of direct intervention with the franchisees in the future, such as conducting audits, was the reason why it was defrauded. "A claim of fraud cannot ordinarily be predicated on unfulfilled promises or statements regarding future events." *Abi-Najm v. Concord Condo., LLC*, 280 Va. 350, 362 (2010). The Complaint centers on negotiations leading to the July 2026 Amendment and future dealings between the parties. These allegations concern expected contractual outcomes, not independently actionable misrepresentations of existing fact.

Third, The fraud claim is barred by Virginia's economic loss rule. Virginia maintains a strict distinction between contract and tort. A tort claim cannot proceed where the duty allegedly violated arises solely from contractual obligations. *Filak*, 267 Va. at 618. "[W]hen a plaintiff alleges and proves nothing more than disappointed economic expectations, the law of contracts, not the law of torts, provides the remedy for such economic losses." *Id.*

The alleged fraud here concerns the contractual exclusivity provisions, the negotiation of contract amendments, and the parties respective contractual rights and obligations. All of these duties arise from the parties' agreements. Accordingly, Plaintiff impermissibly seeks tort remedies for a contract dispute.

Fourth, Plaintiff has not plausibly alleged reliance. The Virginia Supreme Court, in applying the test of justifiable reliance has said:

> that parties to a settlement agreement that [are] in an adversarial relationship and represented by counsel at the time of negotiation and settlement . . . will be *strictly held to this reasonable reliance standard* under Virginia law when seeking to vitiate the settlement based on claims of detrimental reliance on the misrepresentations and/or omissions of information by the adversary.

*Sweely Holdings, LLC v. SunTrust Bank*, 296 Va. 367, 384, 820 S.E.2d 596, 606 (2018) (emphasis added).

The Amendment here expressly states the parties would work toward a term sheet, the parties would work toward a definitive agreement, and provided payment and release obligations which were contingent on future events. Taking a strict look at the actions of the Plaintiff in relying upon what it asserts to be unfounded breach allegations by Defendant, the Complaint fails to set forth a plausible set of facts that reliance was reasonable or justified. Plaintiff, a sophisticated business entity represented by management and experienced in franchise operations, signed the Amendment itself while the parties were negotiating over alleged breaches of the Contract with the specter of litigation looming. Moreover, Plaintiff asserts Labb made unfounded allegations of exclusivity breaches by the franchisees, but Plaintiff is the party with the duty to conduct an audit. Plaintiff cannot plausibly argue it was deceived when it was the party that was supposed to have or obtain the information supporting or negating evidence of such breaches. The Complaint does not plausibly explain how reliance on unspecified

statements was reasonable in light of the written Amendment's express terms. Count II should therefore be dismissed.

**D. Count III fails to state a claim for declaratory judgment.**

Permitting Count III to proceed would improperly transform virtually every contract dispute into a declaratory-judgment action, contrary to the intended purpose of the Act. The Declaratory Judgment Act does not create an independent cause of action. 28 U.S.C. § 2201 says the court *may* provide declaratory relief where an underlying justiciable controversy exists. Because the statute says *may*, the court's jurisdiction to issue declaratory relief is discretionary. *Aetna Cas. & Sur. Co. v. Quarles*, 92 F.2d 321, 324 (4th Cir. 1937). Declaratory relief is an extraordinary remedy designed to resolve uncertainty about rights before they have fully matured into an accrued cause of action. *Id.* The court should decline to exercise its discretion to provide declaratory relief simply to obtain a second adjudication of an already accrued contract dispute. *Aetna Cas. & Sur. Co. v. Quarles*, 92 F.2d 321, 324 (4th Cir. 1937) (finding the court's discretion "should not be exercised for the purpose of trying issues involved in cases already pending, especially where they can be tried with equal facility in such cases.") When "another remedy" is available to a party that is "more effective or appropriate…it is neither necessary nor proper to issue the declaration." *Id.* at 325-26.

Plaintiff asserts Laab breached the parties' Agreement and utilized fraud to obtain the Amendment, both of which are denied, and Plaintiff has already asserted remedies to resolve the dispute in the form of its first two counts for breach of contract and fraudulent inducement. Plaintiff alleges Defendant already breached the contract and seeks damages for that breach. A declaration resolving exactly the same contractual issue generally adds no prospective function. The requested declaration will resolve precisely the same contractual issues this Court must

decide in adjudicating the plaintiff's breach of contract and fraud claims. Every declaration sought by Plaintiff merely restates issues already embedded in Counts I and II: 1) whether Defendant breached the Agreement, 2) whether the amendment is enforceable, 3) whether fees were authorized, and 4) whether Plaintiff may terminate obligations.

Resolution of the substantive claims necessarily resolves these issues. Declaratory relief here serves no useful or independent purpose, will not resolve any additional uncertainty between the parties, and should therefore be dismissed or declined under the discretionary standard established by the Fourth Circuit. Accordingly, Count III serves no independent purpose and should be dismissed.

**E. The Amendment is an enforceable modification to the parties' Agreement.**

Plaintiff is wrong in its arguments that the Amendment is unenforceable because it either lacked consideration or that was merely an agreement to agree. No additional consideration was required for the Amendment, and the Amendment was a divisible contract.

**1. No additional consideration was required for the Amendment.**

The Agreement is subject to modification by the parties if there is assent from both parties. *Gustafson v. Southland Life Ins. Co.*, 885 F. Supp. 854, 858 (E.D. Va. 1995) (citing *Stanley's Cafeteria Inc. v. Abramson*, 226 Va. 68, 72 (1983) ("In Virginia, however, parties can mutually assent to modify a contract.")). Generally, consideration is required for the modification of a contract. *Jones v. Kessler*, 98 W. Va. 1, 16 (1925). However, when a controversy of law or fact arises between the parties under the existing contract and they adjust the terms, the new or modified contract is not without consideration and it is not admissible to go behind it to ascertain which party was right in that contention. *Producers' Coal Co. v. Mifflin Coal Mining Co.*, 82 W. Va. 311, 317 (1918). Moreover, under the UCC, no consideration for

the modification of the Agreement is required. Va. Code §8.2-209(1) ("An agreement modifying a contract within this title needs no consideration to be binding.")

Here, the parties entered into the Agreement which required Defendant to supply Plaintiff with both goods and services. The Agreement was later modified by the Amendment. The circumstances behind the Amendment, as alleged by Plaintiff, was that Plaintiff agreed to the Amendment because Defendant had asserted multiple breaches of the exclusivity provision. An assertion Plaintiff disputed. Under these circumstances and pursuant to *Producer's Coal*, not only is there no need for consideration, but the court is not to consider and determine which party was right in their competing contentions about exclusivity breaches.

**2. The Amendment is divisible, and the failure or unenforceability of one provision does not invalidate its independent provisions or the underlying agreement.**

Plaintiff's position appears to assume the Amendment must be treated as an indivisible whole because the parties did not reach the "final definitive agreement" contemplated by Sections 2 and 3, none of the Amendment may have continuing effect. Virginia law does not support that conclusion. Under Virginia law, whether a contract containing multiple promises is entire or divisible turns principally on the parties' intent, determined from the language they used and the subject matter of their agreement. *Eschner v. Eschner*, 146 Va. 417, 421-22 (1926). *Eschner* explains that divisibility of the subject matter, although not conclusive, is an important circumstance in determining that intent. *Id.* More recently, the Supreme Court of Virginia applied essentially the same intent-based approach in *Schuiling v. Harris*, 286 Va. 187, 193 (2013). There the Court examined the language employed in the agreement in determining whether a provision identifying a particular arbitration administrator was integral to the parties'

bargain or could be severed while leaving their agreement to arbitrate intact. *Id.* at 193-194. The Court held the designation severable and enforced the remaining contractual obligation. *Id.* at 196.

That principle is especially compelling here because the Amendment divides the parties' undertakings into four separately identified sections addressing materially different subjects:

1. Section 1 establishes a new fee structure and addresses announcement of that fee structure to franchisees;
2. Section 2 addresses continued negotiations toward a term sheet and eventual definitive agreement;
3. Section 3 addresses settlement of historical violations of the original Agreement in exchange for a $100,000 payment and contemplated execution of a definitive agreement; and
4. Section 4 expressly provides that the original Agreement remains in full force and effect except insofar as the Amendment specifically modifies it.

Those provisions need not operate as a single, indivisible exchange. Section 1 must be given effect without any court determining what terms the parties might ultimately have negotiated under Section 2. Likewise, obligations arising under the original Agreement must continue under Section 4 regardless of whether Section 2 produced a future agreement. *Eschner* demonstrates why this Amendment should be distinguished from an indivisible contract. There, the Supreme Court found the promises indivisible because a single consideration, the wife's relinquishment of her property rights, supported the husband's several undertakings. *Eschner*, 146 Va. at 421-24. Here, by contrast, the Amendment addresses multiple distinct transactions and performances: new fees, communications to franchisees, future negotiations, settlement of

historical claims, payment of $100,000, and preservation of the existing Agreement. That structure strongly supports divisibility rather than one integrated exchange.

**a) Section 4 provides particularly strong evidence that the parties did not intend the Amendment to supplant the Agreement unless a particular provision actually modified it**

The parties expressly agreed that the original Agreement remains "in full force and effect" except to the extent specifically modified by the Amendment. That language defeats any suggestion that unsuccessful negotiations over the contemplated definitive agreement automatically extinguished either the preexisting Agreement or independent modifications already accomplished by the Amendment. Virginia courts interpret contracts to implement the parties' intention as expressed in their written language. The Amendment must therefore be read not as replacing the original Agreement wholesale, but as making specified modifications while affirmatively preserving everything else.

Section 4 serves two related functions. First, it supplies compelling evidence against indivisibility. If the parties intended the Amendment to constitute one, all or nothing transaction dependent upon execution of a later definitive agreement, there would be little reason to expressly provide that the Agreement continued in full force except where already modified. Second, Section 4 supplies the consequence of the parties' failure to reach a definitive agreement. The parties did not provide that failure to execute that future agreement would terminate the original Agreement. To the contrary, they expressly preserved it as otherwise expressly amended. Plaintiff now asks the Court to invent a new consequence for the failure of later negotiations that conflicts with the contractual language the parties actually chose.

**b) Section 2's potential unenforceability as an "agreement to agree" does not render the amendment's independent provisions unenforceable.**

Section 2 appears materially different from Section 1. Virginia law distinguishes an enforceable present contractual undertaking from an unenforceable promise to reach an agreement in the future. In *W.J. Schafer Associates, Inc. v. Cordant, Inc.*, 254 Va. 514, 519 (1997), the Supreme Court of Virginia held agreements to agree in the future are too vague and indefinite to enforce where the essential terms have not been established. Virginia requires mutual assent to reasonably certain terms before a contractual promise may be enforced. See *Allen v. Aetna Casualty & Surety Co.*, 222 Va. 361, 364 (1981).

These doctrines support, rather than undermine, severability here. Section 2 simply establishes an anticipated negotiating process rather than presently establish the essential terms of the ultimate agreement. If so, the appropriate consequence under *Schafer* is that the Court declines to compel the parties to enter the contemplated definitive agreement. It does not follow that every separate promise appearing in the same Amendment disappears. Section 1 was not contingent upon Section 2. Section 1 contains present and objectively ascertainable duties: a particular fee structure and an obligation concerning announcement of that fee structure. The Amendment therefore resembles contracts containing both presently enforceable undertakings and provisions governing contemplated future arrangements. The fact that the latter never matured into an enforceable contract does not invalidate the former.

**c) Section 3 Contains Distinct Obligations and Conditions That Can Be Analyzed Separately From Section 1**

Section 3 concerns an entirely different subject matter from Section 1, resolution of historical violations of the original Agreement. As described, the contemplated settlement required two events that did not occur, payment of $100,000 and execution of a final definitive agreement governing the parties' future relationship. Neither event occurred. (Dkt. No. 1 ¶24.) Accordingly, the Court can determine the legal consequence of nonperformance under Section 3 without disturbing Section 1. To the extent Section 3 conditioned the release or settlement of past violations on payment of $100,000 and/or execution of a definitive agreement, the failure of those conditions means the contemplated settlement never became operative according to its terms. It does not mean that an unrelated fee modification in Section 1 ceased to exist.

An important distinction from *Eschner* is that the consideration and performance in *Eschner* were intertwined in a single settlement bargain. Here, Sections 1 and 3 can readily be performed, breached, or enforced independently. The failure of the Section 3 settlement transaction does not require judicial excision of Section 1. Pursuant to Section 4, it simply leaves the parties subject to Agreement with those modifications that actually became effective.

## IV. Plaintiff has not demonstrated immediate and irreparable harm justifying expedited proceedings.

The cornerstone of any request for emergency injunctive relief is a clear showing of imminent irreparable harm. *Winter*, 555 U.S. at 22. Mere injuries that can be accommodated by the availability of a claim for money damages are not an irreparable harm. *Klein v. PepsiCo, Inc.*, 845 F.2d 76, 80 (4th Cir. 1988). "'[T]he basis of injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies.'" *Direx Israel, Ltd. v.*

*Breakthrough Med. Corp.*, 952 F.2d 802, 812 (4th Cir. 1991) (quoting *Sampson v. Murray*, 415 U.S. 61, 88, 39 L. Ed. 2d 166 , 94 S. Ct. 937 (1974)).

Here, Plaintiff's motion identifies alleged price increases and operational impacts resulting from an ongoing commercial relationship. Those allegations concern economic injuries that are compensable through an award of money damages if Plaintiff ultimately prevails. Economic losses generally do not constitute irreparable harm because they can be remedied at the conclusion of litigation. See *Hughes Network Sys., Inc. v. InterDigital Commc'ns Corp.*, 17 F.3d 691, 694 (4th Cir. 1994) ("Mere injuries, however substantial, in terms of money, time and energy necessarily expended are not enough."); *Sampson*, 415 U.S. at 90.

In this case, Plaintiff has filed suit seeking damages in its claims for breach of contract and fraudulent inducement. Unsurprisingly, Defendant intends to seek substantial damages from Plaintiff for its breach of the agreements between the parties. Moreover, the original agreement between the parties contained limitations of warranties and remedies available to Plaintiff, limitations that were accepted by Plaintiff. (Dkt. No. 1-2 § 3.) Plaintiff cannot rely upon vague allegations of increased prices, additional business expenses, or ordinary contractual disputes to establish the type of irreparable harm necessary to warrant emergency Court intervention.

Plaintiff has asserted an "economic emergency… would result from Defendant shutting off the software then and currently being used by Plaintiff and its franchisees." (Smith, John Decl. Dkt. No. 8-1 ¶7.) These claims of an economic emergency are without factual foundation and are false. Defendant has no intention or scheduled timeframe to shut down the software used by Plaintiff and its franchisees. Defendant does not intend to imminently shut off the software and has not communicated such an intent to Plaintiff or any of its franchisees. Doing so would be a breach of the prevailing contract and expose Defendant to damages that do not currently

exist. Defendant does not want to create damages for Plaintiff to pursue by turning off the software. Defendant would only suspend a user's access to the software for matters such as violations of the terms of service or for non-payment more than 30 days past due. Since there is no imminent threat of Defendant terminating access to the existing software, there is no need for the exceptional remedies of a temporary restraining order or preliminary injunction.

## V. The balance of the equities does not favor Plaintiff and does not support issuance of a temporary restraining order or preliminary injunction.

Plaintiff alleges only economic and operational impacts arising from a commercial dispute as discussed *supra*. Defendant also intends to seek economic damages against Plaintiff via a counterclaim for Plaintiff's breaches of the Agreement. Thus, the risk of harm is at best equal between the parties. *Direx Israel, Ltd.*, 952 F.2d at 808 ("if 'the plight of the defendant [is] not substantially different from that of the plaintiffs,' that is, if there is no imbalance of hardship in favor of the plaintiff, then 'the probability of success begins to assume real significance,' and interim relief is more likely to require a clear showing of a likelihood of success).

Plaintiff argues damage to its goodwill and reputation due to communications between Defendant and the franchises due to supposed improper communications between Defendant and the franchisees. A similar risk to the goodwill and reputation of Defendant exists based upon communications between Plaintiff and its franchisees claiming the Amendment is not enforceable and not to pay the new pricing. Moreover, as shown by the Ramsey and Konecke Declarations, these fears of damage to goodwill and reputation are unsupported. Defendant has only had legitimate business communications with the franchisees concerning their ongoing working relationship.

Here, where the alleged harm is monetary and compensable and there is no factual support to justify a threat to Plaintiff's goodwill and reputation, the balance of equities does not support emergency proceedings.

**VI. Plaintiff has not shown the public interest justifies issuance of a temporary restraining order or preliminary injunction.**

The Fourth Circuit requires a clear showing on the public-interest factor before extraordinary injunctive relief may issue. *Real Truth About Obama, Inc. v. FEC*, 575 F.3d 342, 346 (4th Cir. 2009). The public interest is not served by accelerating proceedings and disrupting established commercial relationships based upon disputed allegations before the facts have been fully developed. Here, Plaintiff requests emergency judicial intervention prior to a full trial in an ongoing contractual and commercial dispute involving pricing, service terms, and franchise relationships. The public has a substantial interest in the predictable enforcement of contracts, the orderly resolution of business disputes through regular judicial procedures, and the preservation of due process protections that afford litigants a meaningful opportunity to be heard before significant injunctive relief is imposed. Defendant intends to assert breach of contract claims against Plaintiff. The public interest is best served by permitting the parties to proceed under the Federal Rules of Civil Procedure to fully litigate these contractual questions. Accordingly, the public-interest factor weighs strongly against Plaintiff's request for the extraordinary judicial relief of a temporary restraining order or a preliminary injunction.

**VII. Plaintiff has not satisfied Rule 65(b)'s requirements for emergency relief.**

To the extent Plaintiff seeks a hearing on a temporary restraining order, Rule 65(b) authorizes such relief only in exceptional circumstances and upon a specific factual showing that

immediate and irreparable injury will occur before the opposing party can be heard. Fed. R. Civ. P. 65(b)(1).

The motion for a temporary restraining order contains generalized assertions regarding future harm, which are disputed factually by the Ramsey and Konecke Declarations. Absent the stringent showing required by Rule 65, expedited treatment is unwarranted.

## CONCLUSION

Because Plaintiff failed to set forth a likelihood of success on the merits, irreparable harm, favorable equities, or that the requested relief serves the public interest, Plaintiff cannot satisfy any of the requirements for a temporary restraining order or preliminary injunctive relief. The failure to satisfy even one of these independent requirements is fatal to Plaintiff's request; failing all four, Plaintiff's motion for a temporary restraining order and a preliminary injunction should be denied in its entirety.

WHEREFORE, for the foregoing reasons, Defendant Ramsey Diagnostics Corp. respectfully requests this Court deny Plaintiff's Motion for a Temporary Restraining Order and a Preliminary Injunction, award Defendant its costs and attorney's fees in defending against this Motion as provided for in the parties Agreement, and to provide such further relief deemed necessary and just.

Respectfully submitted this 2nd day of October, 2026.

**RAMSEY DIAGNOSTICS CORP.**

By:/s/David B. Oakley
Of Counsel

J. Bryan Plumlee, Esq., VSB No.: 44444
David B. Oakley, Esq., VSB No.: 72226
POOLE BROOKE PLUMLEE PC
4705 Columbus Street, Suite 100
Virginia Beach, VA 23462
Phone: 757-499-1841
Facsimile: 757-552-6016
bplumlee@pbp-attorneys.com
doakley@pbp-attorneys.com
*Attorney for Defendant*

**CERTIFICATE OF SERVICE**

I hereby certify that on the 2nd day of October 2026, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system which will then send the document and a notification of such filing (NEF) to the following party via Electronic Mail:

Jason C, Greaves—jason@binnall.com
Katie L. Raymond—katie@binnall.com

/s/ David B. Oakley

David B. Oakley, Esq., VSB No.: 72226
POOLE BROOKE PLUMLEE PC
4705 Columbus Street, Suite 100
Virginia Beach, VA 23462
Phone: 757-499-1841
Facsimile: 757-552-6016
doakley@pbp-attorneys.com