**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
Norfolk Division

| | | |
|---|---|---|
| FAS-TES FRANCHISE SYSTEMS, LLC,<br><br>Plaintiff,<br><br>v.<br><br>RAMSEY DIAGNOSTICS CORP.<br>d/b/a LABB,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action<br>No. 2:26-cv-00961-RBS-LRL |

**DECLARATION OF JAMES RAMSEY IN OPPOSITION TO PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

I, James Ramsey, declare as follows:

## I. DECLARANT

1. I am over the age of eighteen and competent to make this declaration. I am the Chief Executive Officer of Ramsey Diagnostics Corporation d/b/a Labb ("Labb"), 2115 Granby Street, Norfolk, Virginia 23517. The facts stated in this declaration are within my personal knowledge or are drawn from Labb's business records, which are made and kept in the regular course of Labb's business, and if called as a witness I could and would testify competently to them.

2. I submit this declaration in opposition to Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction (DKT. No. 8) and in response to the Declaration of John Smith (DKT. No. 8-1) (the "Smith Declaration"). Paragraph references below are to the Smith Declaration unless stated otherwise.

3. The Smith Declaration refers to me as Labb's President. My title is Chief Executive Officer. Some of my 2026 correspondence, including Exhibit PD-2, carried the title President.

4. I was personally involved in the development of the Labb software platform and have personally managed Labb's relationship with Fas-Tes Franchise Systems, LLC ("Fas-Tes" or "Fastest Labs") since it began up until Jeff Konecke became the President of Labb. I negotiated the original and current agreements between Labb and Fastest Labs on Labb's behalf.

## II. THE PARTIES' AGREEMENTS (RESPONSE TO SMITH DECL. ¶ 2)

5. Paragraph 2 states that the parties "entered into an Original Agreement" in December 2022. That is not accurate. Labb and Fastest Labs first contracted under an agreement dated August 24, 2019. A true and correct copy of that agreement is attached as Exhibit JR-1. The agreement effective December 21, 2022, attached to the Smith Declaration as Exhibit PD-1, is the parties' second agreement. Its title is "Exclusive Supplier and Modified Software Development Agreement" (the "Agreement"). Mr. Smith's own Exhibit PD-2 states that the parties are "currently operating under our second agreement."

6. The Agreement followed Labb's termination of the 2019 agreement after Labb learned that Fastest Labs had been telling franchisees and investors that Fastest Labs owned Labb's software. The Current Agreement contains a conditional path under which Fastest Labs may eventually own a version of the software, but only if Fastest Labs satisfies all of the Agreement's conditions, including its exclusivity obligations.

7. Fastest Labs' exclusivity obligations under the Agreement cover four areas: system software, rapid testing, laboratory testing, and Medical Review Officer ("MRO") services. The Agreement also requires a $0.50 per-unit Development Fee that funds software development. Every test a franchisee sends outside the Agreement deprives Labb of both the revenue on that test and the Development Fee that pays for the very development Mr. Smith says was insufficient.

Because every laboratory drug test requires MRO review, every laboratory test diverted to a non-approved laboratory is also a diverted MRO review.

## III. THE LABB SOFTWARE (RESPONSE TO SMITH DECL. ¶¶ 3 AND 5)

8. Paragraph 3 states the Labb software is obsolete and has been insufficient to keep pace with Fastest Labs' needs. Fastest Labs tells the public and prospective franchisees the opposite. On FastestLabs.com, Fastest Labs and its franchisees describe the technology as **"Advanced, cutting-edge technology"** and **"State-of-the-art testing equipment,"** and Fastest Labs presents its proprietary software and technology as one of the principal reasons to buy a Fastest Labs franchise. True and correct copies of this website page screen shot captured on September 23, 2026, after the date John Smith stated the technology was not sufficient are attached as Exhibit JR-2.

9. Before Labb served its notice of breach and demand to cure on August 11, 2026, attached hereto as Exhibit JR-3, Fastest Labs never once sent Labb a notice of breach of warranty or any claim that the software failed to meet the Agreement's requirements. I have searched my email for any such notice and found none. Fas-Tes's breach of warranty theory appeared for the first time after Labb demanded that Fas-Tes cure its exclusivity breaches.

10. Paragraph 3 also states that Labb made "only a handful of minor modifications" to its core software. That is false. Labb records all work on its existing platform, including Labb Station, the Labb mobile applications, the web dashboard and administrative portals, and the laboratory and MRO integrations, in its Jira issue tracking system under the project "Pocket Labb." A summary of that record, with a register listing every completed item by its Jira issue key so that each entry can be checked against the source system, is attached as Exhibit JR-4. Between January 2023 and July 2026, Labb completed 2,287 work items on that platform: 773 development tasks

and user stories, 604 bug fixes, and 910 support requests. Over the same period Labb shipped 128 named production releases and hotfixes. Labb's software engineers logged at least 4,883 hours on the 794 items for which time was recorded, so actual hours worked were significantly higher. This document was compiled using data from Labb's internal Jira system.

11. That work included integrations with Quest Diagnostics, Cynergy, and Averhealth, DOT testing workflows, the Labb Passport donor credential, a paper chain of custody workflow, HL7 result messaging, accounting export, a migration of the production infrastructure, and security hardening. Exhibit JR-4 does not include development of One by Labb, which is tracked separately. In addition to that work listed in JR-4, Labb built an entirely new platform, One by Labb, on new core technology. One by Labb includes built-in contract management, accounting automation, email marketing, content management, and AI-assisted training and support. I am not aware of another drug testing platform that offers these capabilities together.

12. Paragraph 5 lists features Mr. Smith says the Labb software lacks. My responses to each are as follows:

(a) Electronic ordering. The Labb platform automates rapid test kit ordering and includes auto-ship with inventory management. I am not aware of another platform in this industry that offers these features.

(b) Real-time result reporting. The Labb platform reports results instantly for a vast majority of rapid screens, laboratory confirmations, and direct-to-laboratory tests, and MRO reports. To the best of my knowledge, there is no software platform in this industry which processes 100% of all tests and MRO reports electronically. Every software platform and every laboratory currently works with some

combination of paper and electronic custody and control forms ("eCCF"), because paper is still required in many collection settings for logistical reasons.

(c) eCCF for non-DOT and DOT testing. Labb makes available to users literally millions of options to order electronic tests using Labb's eCCF for non-regulated testing. eCCF for federally regulated (DOT) testing is not an industry standard. To my knowledge, only two companies, Abbott's eScreen and CRL's FormFox hold approval for DOT eCCF, and both obtained it under an earlier application process. Despite Abbott's eScreen and CRL's FormFox eCCF system, both organizations process paper chains using a manual process to date. There are no companies or platforms that I am aware of who do not provide some combination of eCCF and paper processed results. The Substance Abuse and Mental Health Services Administration ("SAMHSA") has since revised their application process. I explained all of this to Mr. Smith in person when he visited Labb's Norfolk office on June 1, 2026.

(d) Random testing program management. The current Labb Station does not include a random selection generator. Labb arranged for franchisees to use the random selection system of its MRO partner, Cynergy, while One by Labb was being launched, and certain franchisees use that system today.

(e) Ordering at third-party networks across the United States. The Labb platform has supported network testing since 2023. A Labb Passport issued for a donor can be used at any collection site in the Labb Network, not only at the ordering franchisee's location, and Labb Station supports the network collection flow. (Exhibit JR-4, including PL-1421 (July 14, 2023), PL-1734 (November 3, 2023), PL-2571 (June

3, 2024), PL-2310 (July 3, 2024), and release R056, "Network page" (July 15, 2024).) Labb also offered a program to expand that third-party network. Every Labb Passport and referral link carries a payment code, and Labb pays participating Prime Partners 5% of the revenue generated by each newly registered collection site for two years. A true and correct copy of the program graphic is attached as Exhibit JR-5.

13. Labb was the first company, and is now one of only two companies, to offer mobile app readers for both urine and oral fluid rapid tests. Labb holds U.S. Patent No. 10,340,032 covering the Labb Station rapid screen reader. Labb's onboarding technology is, in my experience, faster and easier than that of any competing platform.

14. Paragraph 5 compares Labb's pricing to competitors. It is impossible for me to respond to a comparison claim without company names, detail, product names and evidence of proposed pricing by which Labb is being compared.

## IV. THE MAY 31, 2026 FRAMEWORK (RESPONSE TO SMITH DECL. ¶¶ 4 AND 5)

15. Paragraph 4 quotes Exhibit PD-2 selectively. The full passage states that Labb rebuilt its platform because "incremental improvement on the existing platform could not deliver what the market needs. The opportunity in front of us required a platform built for the next decade, not an extension of what we built for the last one." PD-2 goes on to state One by Labb "is not an iteration on Labb's existing software" and that the new platform "is substantially more than the software the original agreement contemplated."

16. Those statements describe what the new platform adds, not a defect in the existing one. As PD-2 explains, One by Labb replaces tools that Fastest Labs franchisees currently buy separately from other vendors, including customer relationship management software such as

HubSpot and document and contract management software such as PandaDoc. Paragraph 5 treats that description as an admission that Labb's software "fails to meet applicable industry standards." PD-2 contains no such admission.

**V. EXCLUSIVITY BREACHES (RESPONSE TO SMITH DECL. ¶¶ 6, 8, 9, AND 10)**

17. The review described in PD-4 reconciled rapid test kit purchases against tests recorded in Labb's platform. It could not measure laboratory or MRO diversion. When a franchisee sends a specimen directly to a non-approved laboratory such as CRL or USDTL, or uses a non-approved MRO, that test never enters Labb's platform. A reconciliation of Labb's own records therefore cannot detect it. Only Fastest Labs and its franchisees hold those records, and Fastest Labs has refused to audit them or produce the requested documents. A simple export of franchisee Payee logs from Quickbooks Online would quickly highlight franchisee violations or lack thereof. Fastest Labs refused to provide Labb with access to Quickbooks.

18. In my conversations with Fastest Labs franchisees, I have not found a single franchisee who reported using Labb's authorized labs and MROs exclusively. In many conversation with franchisees, they reported receiving assistance and instruction from Fas-Tes with setting up an account with a third-party laboratory such as CRL and/or USDTL. These verbal conversations include Judy Praska, Charlie Reeves, Spencer Davidson, and many others. Neither CRL nor USDTL is an approved laboratory under the Agreement. CRL controls FormFox, a direct competitor of Labb, as Exhibit PD-2 notes.

**VI. THE SEPTEMBER 30, 2024 EMAIL (RESPONSE TO SMITH DECL. ¶ 11)**

19. Paragraph 11 states that I instructed Fas-Tes and its franchisees to direct CRL testing through third parties. That is false, and emails in Mr. Smith's own Exhibit PD-5 shows it.

20. The Agreement permits a franchisee to use a third-party laboratory for special laboratory work only if two conditions are met: (1) the Fastest Labs home office gives the franchisee written approval, with a copy sent to Labb; and (2) the approved volume does not exceed 10% of that franchisee's total laboratory testing volume. (Dkt. No. 8-2 §1(c).) Labb has never received a single written authorization from Fastest Labs approving any franchisee's use of any non-Labb laboratory, including CRL and/or USDTL.

21. To make compliance simple, I personally created and distributed an authorization form for franchisees to use if they wished to use a third-party laboratory on June 13, 2025 through a HubSpot email with the subject line of "Why Compliance Matters - The agreement with Labb". According to HubSpot open rates, John Smith opened this email seven (7) times. Prior to Labb sending Fastest Labs a breach of contract notices to cure and signed for by Fastest Labs on August 18, Fastest Labs has never provided Labb with a single waiver form. A true and correct copy is attached as Exhibit JR-6. To the best of my knowledge, no franchisee or Fastest Labs representative has ever completed and returned it to Labb. I have searched my email for any written authorization from Fastest Labs for any franchisee to use a non-Labb laboratory and found none.

22. Exhibit PD-5 shows the following. The franchisee, Marvin Spears, already had his own CRL account, and CRL reported that he had changed the MRO on that account on September 17, 2024, nearly two weeks after my email. Cynergy's new-customer team then told Mr. Spears that "USDTL and CRL do NOT fall under LABB," that he would become a direct customer of Cynergy for those laboratories, and that "it is under Mr. Smith's direction that we are to do this." Mr. Smith then told Mr. Spears that this "just means that you pay them directly," and answered "Yes and yes" when asked whether to pay Cynergy directly.

23. My only statement in that thread was: "Make sure you have CRL and USDTL reporting to Cynergy and let Cynergy know to report to Labb." That instruction was intended to make sure results from an existing arrangement were visible in the franchisee's Labb records. It did not direct anyone to use CRL, and it was not the written home office authorization the Agreement requires. PD-5 shows that the direct CRL and USDTL arrangement was made at Mr. Smith's direction, not mine.

## VII. LABB'S COMMUNICATIONS WITH ITS OWN CUSTOMERS (RESPONSE TO SMITH DECL. ¶¶ 12, 15, 16, AND 19)

24. Fastest Labs franchisees are Labb's customers. Each franchisee that uses the Labb platform accepts Labb's Terms of Service directly, and each franchisee that participates in Labb's Channel Partner Program ("CPP") signs a CPP agreement directly with Labb. Nothing in the Agreement requires Labb to obtain Fastest Labs' approval before offering new products or services to its customers.

25. The CPP is an optional Labb program. Franchisees choose to join it, pay Labb a monthly membership fee, and may leave it. Labb has sent CPP members regular marketing communications for more than fourteen months. Before Labb served its breach notice, Fastest Labs never asked Labb in writing to stop those communications or to stop the CPP.

26. On June 3, 2026, I emailed Mr. Smith and Mr. Kunz that I was about to communicate "very broadly" with CPP members about One by Labb, described Labb's role, stated that Labb "do[es] not and cannot speak for the Fastest Labs home office at any time," and invited them to tell me if they wanted me to communicate differently. Mr. Smith replied the same day: "Generally yes we are on the same page. I think these are great comments." (Exhibit JR-4.)

27. On June 12, 2024, Mr. Smith himself sent Labb a list of email addresses for all Fastest Labs owners so that Labb could communicate with them directly. A true and correct copy is attached as Exhibit JR-10.

28. Franchisees regularly contact Labb on their own initiative, including to request Labb's help responding to requests for proposals, and franchisees have continued to enroll in the CPP, including a franchisee who executed a CPP agreement as recent as September 11, 2026. Two franchisees, Spencer Davidson of Utah and Marvin Spears of South Carolina, asked Labb for permission to present the CPP at Fastest Labs' national conference in October 2026, and I personally, verbally approved those requests. Both Marvin and Spencer told me that Fastest Labs plans to promote the CPP at that conference. For Clarity, the CPP is a Labb program and has nothing to do with Fastest Labs other than Fastest Labs franchisees have optionally signed up to participate.

29. Exhibit PD-6 is Labb's September 1, 2026 update bulletin. It announced discounts of up to 80% on Omega hair testing, a new breath drug test available through Omega, a free email marketing pilot for CPP members, and open CPP enrollment. It did not require any franchisee to purchase anything. It identified Omega as Labb's authorized hair testing laboratory, which reflects the Agreement as explained in Section X below. Exhibit PD-8 is a Labb marketing communication to CPP members.

30. Paragraph 15 refers to a "previous agreement with Labb to cease such communications." Mr. Smith does not identify any such agreement, nor has he provided any documentation to this fact, and I am aware of none.

31. Paragraphs 12, 15, 16, and 19 do not identify a single Labb communication that contradicted anything Fastest Labs told its franchisees, and Paragraph 16 does not identify the

franchisee who allegedly withheld an option to open a new location. I cannot respond to unidentified communications. Every Labb communication I am aware of announced new products, discounts, or sales and marketing support that franchisees could accept or decline.

**VIII. ALLEGED SMEAR CAMPAIGN AND EXHIBIT PD-7 (RESPONSE TO SMITH DECL. ¶¶ 13 AND 14)**

32. To my knowledge, no Labb employee or representative has generated any documents designed to disparage the character or credibility of Fastest Labs.

33. Exhibit PD-7 is a single text message I sent in response to franchisee Jennifer Taylor informing her that her account was under audit. Her Labb Station account showed that she had reported far more rapid test results in the Labb platform than she had purchased rapid test kits from Labb.

**IX. LABB HAS NOT THREATENED TO SHUT OFF THE SOFTWARE (RESPONSE TO SMITH DECL. ¶ 18)**

34. Paragraph 18 states that Labb intends to imminently shut off the software used by Fastest Labs and its franchisees. That is false. Labb has sent no such communication. Labb suspends a user's access only for serious and repeated violations of its Terms of Service or for non-payment more than 30 days past due. Labb has no interest in terminating the Agreement and intends to hold Fastest Labs to its full remaining term.

35. Labb has repeatedly kept franchisees on the platform even after serious Terms of Service violations. John Smith has failed to provide written documentation or evidence to back his claim that Labb "…intend to imminently shut off the software used by Fastest Labs and its franchisees."

## X. HAIR TESTING (RESPONSE TO SMITH DECL. ¶ 17)

36. Paragraph 17 states that hair testing has never been part of any agreement with Labb. Hair testing is laboratory testing. Laboratory testing exclusivity arises under Sections 1(a)(3) and 1(a)(6) of the Agreement and Exhibit A, took effect as to laboratory and MRO services on December 21, 2023 under Section 1(b), and extends under Section 1(d) to new tests Labb offers, subject only to Section 1(c). Labb offers hair testing through Omega. Labb's September 1, 2026 bulletin identified Omega as the authorized hair testing laboratory and cut franchisees' hair testing prices by up to 80%. It did not require any franchisee to offer hair testing.

## XI. AMENDMENT NO. ONE AND PRICING (RESPONSE TO SMITH DECL. ¶¶ 7, 10, AND 20)

37. The document Mr. Smith calls an "LOI" is titled Amendment No. One. Fastest Labs executed it on July 6, 2026 (Exhibit PD-3). Mr. Kunz himself called it "the amendment that was agreed to on July 3rd and executed on July 6th," and Mr. Konecke's July 21, 2026 email in PD-4 refers to it as "the amendment to agreement."

38. Paragraph 7 states that Fastest Labs signed "errantly" because of an economic emergency that would result from Labb shutting off the software. Labb did not threaten to shut off the software to obtain Amendment No. One. That is categorically false and is designed in an attempt to paint Labb in a negative and threatening light. Mr. Kunz's July 29, 2026 email gives no such reason. It states: "In good faith, we proceeded to sign the agreement and send out the system wide communications." In the same email he wrote that if a new agreement was not reached, "we will live with the current one-sided agreement." (Exhibit JR-7.)

39. Amendment No. One established the fees that took effect on September 1, 2026. Fastest Labs itself sent its franchisees a payment notice about the new fees on July 9, 2026, then reversed it about three weeks later with an instruction not to pay. On September 1, 2026, during

the cure period, Fastest Labs told its owners that the new rates had never been agreed to and instructed them not to sign anything from Labb reflecting the new terms. True and correct copies of these notices are attached as Exhibit JR-8.

## XII. TIMING OF THIS LAWSUIT

40. Labb served its notice of breach on August 11, 2026 and was signed for by Fastest Labs on August 18, 2026, giving Fastest Labs 30 days to cure. The cure period expired on September 18, 2026. Fastest Labs told Labb that it would not cure and would not conduct an audit, and it filed this action on September 11, 2026, before the cure period ran and before Labb could file its own claims. The software, warranty, and communications complaints in the Smith Declaration were never raised with Labb in writing before Labb's breach notice.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on October 2, 2026, in Norfolk, Virginia.

James Ramsey
Chief Executive Officer
Ramsey Diagnostics Corporation d/b/a Labb