**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
Norfolk Division

| | | |
|---|---|---|
| FAS-TES FRANCHISE SYSTEMS, LLC,<br><br>Plaintiff,<br><br>v.<br><br>RAMSEY DIAGNOSTICS CORP.<br>d/b/a LABB,<br><br>Defendant. | ) | Civil Action<br>No. 2:26-cv-00961-RBS-LRL |

**DECLARATION OF JEFFERY KONECKE**

I, Jeffery Konecke, declare as follows:

1. I am over eighteen years of age and competent to make this declaration. I am the President of Ramsey Diagnostics Corporation d/b/a Labb ("Labb"), headquartered at 2115 Granby Street, Norfolk, Virginia 23517. I began working with Labb in April 2026 as a consultant, and in my early communications and meetings with Fastest Labs I described myself as joining Labb as Vice President of Sales. In June 2026, Labb decided internally that I would become President and that Mr. Ramsey would serve as Chief Executive Officer, and from that point I used the title President. I became a Labb employee on July 1, 2026. Labb's Board of Directors formally approved my appointment as President at its meeting in August 2026. My employment agreement identifies my initial position as Vice President of Sales. The facts stated in this declaration are within my personal knowledge or are based on my review of Labb's business records and correspondence maintained in the ordinary course of Labb's business, as indicated. If called as a witness, I could and would testify competently to them.

2. I have worked in the drug and alcohol testing industry for approximately forty years. My experience includes work as a toxicologist in a SAMHSA-certified laboratory; service as President of two point-of-care testing ("POCT") drugs-of-abuse test manufacturers; work as a regulatory consultant in the POCT drugs-of-abuse field; employment with two laboratories and involvement in the acquisition and merger of two other laboratories; and service as a subject matter expert consultant on several drug-testing projects funded through the American Probation and Parole Association, the U.S. Department of Justice, and the National Institute of Justice.

3. My direct involvement in the relationship between Labb and Plaintiff Fas-Tes Franchise Systems, LLC ("Fas-Tes" or "Fastest Labs") began on May 7, 2026, when I met in person with Fas-Tes's President and CEO, Matt Kunz, and its Executive Vice President, John Smith , in San Antonio, Texas. From that date forward I was Labb's principal negotiator with Matt Kunz and John Smith concerning pricing, the Amendment described below, and a proposed new agreement. Throughout, I acted on Labb's behalf with James Ramsey's knowledge and authorization; he was copied on much of the correspondence described below and signed the Amendment for Labb. Matters that predate May 7, 2026, or that were handled by Labb's CEO, James Ramsey, are addressed in his separate declaration.

4. On May 7, 2026, I met in person with Matt Kunz and John Smith of Fastest Labs in San Antonio, Texas. This was my introductory meeting with them, and it took place before any discussion of the Amendment. During the meeting, I described features planned for Labb's new platform that would replace services franchisees were then using and paying for separately, including document management and e-signature functions comparable to PandaDoc, and a CRM component that would eliminate the need for HubSpot.

5. I also described a consolidated, centralized billing and payment feature. Under this feature, franchisee billing and credit card transactions would be processed through Labb's payment processor. I explained that this would reduce the time franchisees spend on billing and collections and would give the Fastest Labs home office full visibility into franchisee activity.

6. In response, Mr. Kunz stated that processing credit card transactions through Labb's payment processor would not work, because all franchisee credit card processing currently goes through the Fastest Labs home office and contributes nearly $1.2 million to Fastest Labs. Mr. Kunz's objection was limited to the credit card processing component. I responded that I would discuss with James Ramsey how Labb could work around that concern.

7. On July 6, 2026, Labb and Fas-Tes executed a written document titled "Amendment No. One" to the parties' December 21, 2022 Exclusive Supplier and Modified Software Development Agreement (the "Original Agreement"). The Amendment was signed by James Ramsey for Labb and by Matt Kunz, as CEO, for Fas-Tes, and both signatures are dated July 6, 2026. (Exhibit JK-1)

8. The Smith Declaration refers to the Amendment as a "Letter of Intent" or "LOI." That is not its title and not what it is. It is a fully executed amendment. The parties signed it "intending to be legally bound," and Section 4.1 provides: "Except as expressly amended by this Amendment, the Agreement remains in full force and effect in accordance with its terms. This Amendment is incorporated into and made a part of the Agreement." Matt Kunz himself called it an amendment: when he returned it on July 6, 2026, his email stated, "Here is the signed amendment." (Exhibit JK-1A.) And in his July 29, 2026 email to me, he again referred to "the amendment that was agreed to on July 3rd and executed on July 6th." (Exhibit JK-4.)

9. Section 1 of the Amendment sets the franchisee fee structure: Section 1.1 requires Fas-Tes to announce the fee structure to all franchisees; Section 1.2 sets a flat Software Fee of $249 per month; Section 1.3 sets a Revenue-Based Fee of $149 per month for each $10,000 tier of a franchisee's monthly revenue ($149 for $0–$10,000, $298 for $10,001–$20,000, and so on); Section 1.4 addresses platform use, as described in the next paragraph; and Section 1.5 makes the fees effective September 1, 2026 and provides that Section 1 controls over any conflicting fee or pricing provision of the Original Agreement.

10. Section 1.4, titled "Application Regardless of Platform," is explicit: "The fees in this Section 1 apply to each franchisee regardless of which software platform the franchisee is then using." Nothing in Section 1 conditioned the fees on the execution of a later definitive agreement, on the launch of any new platform, or on payment of the separate settlement outlined in Section 3.

11. The fact that the new fees stood on their own, independent of anything else, was confirmed in writing in the Amendment and even before the Amendment was signed. On July 3, 2026, three days before signing, I sent Matt Kunz a text message stating that Labb would send him an amendment and that: "The new pricing goes into effect September 1. Regardless. It is not tied to anything - as the $100k payment is." In the same text message I wrote: "Please note: that nothing in this agreement sets aside anything in the old agreement until the new agreement is done, other then what was laid out in email." I closed by asking: "Please affirm this and we will get the amendment over." Matt Kunz replied: "Thank you, Jeff and yes." (Exhibit JK-2).

12. Paragraph 20 of the Smith Declaration states that the new pricing applies "to get access to One by Labb." Section 1.4 of the Amendment says the opposite, as stated above. He also misstates the revenue-based fee as "a revenue module fee of $150 for every $10,000 of revenue," when the Amendment sets it at $149 for each $10,000 tier of revenue.

13. Paragraph 20 also refers to “various other charges.” For September 2026, Labb billed each Fastest Labs franchisee two line items: the $249 Software Fee and a $149 Revenue-Based Fee. Because no September revenue data existed when September was billed, every franchisee was billed at the lowest ($0–$10,000) tier, and no retroactive adjustment will be made for September. Beginning in October, the Revenue-Based Fee is calculated using the franchisee’s prior month’s revenue, as the Amendment provides. Labb has not added any other charge under the Amendment.

14. The fee change was announced to franchisees by Fas-Tes itself. On July 7, 2026, the Fastest Labs Home Office sent a notice to all franchise owners, which Matt Kunz forwarded to me the same day, stating that “Matt Kunz and John Smith have been meeting directly with Labb President Jeff Konecke, and those conversations have gotten us to a shared vision for the partnership”; announcing that on September 1, 2026 the base platform fee would be $249 per location with a revenue-based finance fee of $149.00 per $10K of revenue; describing the new terms as “what we negotiated for in exchange”; and stating, “We wouldn’t move forward with this if we didn’t believe it puts your locations in a stronger position.” (Exhibit JK-3). The notice does not mention any exclusivity dispute, any threat to disable software, or any pressure from Labb.

15. The same exchange shows that, before the Amendment was signed, Matt Kunz and I agreed that both Fas-Tes and Labb would be notifying franchisees of the new pricing. In my July 3, 2026 message I wrote: “We expect a letter to go to your franchisees within 3 business days. As soon as it goes we need to know so that we can send our letter also.” Matt Kunz replied, “Thank you, Jeff and yes. Please send over the letter,” and said his team would send the systemwide communication the following Monday. (Exhibit JK-2.) The Fastest Labs Home Office sent its

system-wide notice (Exhibit JK-3) on the morning of July 7, 2026. Section 1.1 of the Amendment then required Fas-Tes to announce the fee structure to all franchisees.

16. On July 29, 2026 at 12:22 PM, Matt Kunz emailed me making clear that Fas-Tes would not implement the September 1 fees, would not pay the settlement, and was done negotiating. That same day, James Ramsey replied to all: "Matt, I think it is time for the attorney to get involved and move forward with enforcing the current contract." (Exhibit JK-4). Not in this exchange and at no time after this exchange did Labb agree to any rollback of the new fees listed in the Amendment. Labb treated Mr. Kunz's unilateral statement as having no legal effect and continued to conduct business under the December 2022 Agreement and the Amendment.

17. The Smith Declaration states that Fas-Tes "errantly" entered the Amendment because of Labb's exclusivity allegations and an "economic emergency" from a possible software shutoff (¶ 7). The Amendment was instead the product of two-way negotiation that began at my first meeting with Matt Kunz and John Smith at Fas-Tes's offices in San Antonio on May 7, 2026, which John Smith and I arranged by email (Exhibit JK-5A). At that meeting we discussed the points Fas-Tes wanted to see in any new agreement, and those negotiations continued for about two months before the final Amendment was signed on July 6, 2026.

18. On June 15, 2026, I emailed John Smith (copying Matt Kunz) recapping a call and proposing $499 per month plus $99 per $10,000 of revenue, with a target of a binding term sheet by July 15. On June 17, 2026, John Smith replied with Fas-Tes's own draft term sheet, stated his own calculation of our year-two SaaS revenue under the proposal, and raised objections on our POCT, MRO, and lab drug-test pricing. The same day I responded proposing to find middle ground and scheduled a further call. (Exhibit JK-5).

19. After the Amendment was signed, John Smith continued to negotiate the next agreement in detail with me. On July 13, 2026, I sent John Smith and Matt Kunz Labb's first draft of a "One by Labb – Workplace Health" term sheet, which proposed a ten-year term, with ownership of Fas-Tes's version of the platform transferring to Fas-Tes after year seven (Exhibit JK-6). On July 17, 2026, John Smith returned a revised draft of the term sheet and proposed to change the term of the new agreement to seven years (Exhibit JK-7). On July 20, 2026, I returned Labb's comments to his changes, and stated: "If 7 years then no ownership and not considered a Founding partner. This becomes a straight license deal." (Exhibit JK-7A.) At that point, Labb was willing to proceed on the basis of a 7 year term. On July 23, 2026, John Smith responded in writing: "My mistake on thinking past discussions were for 7 years. It has been 10 since at least my last visit to James. 10 is fine." (Exhibit JK-7B.) On July 24, 2026, I sent Labb's written response confirming the ten-year term could be done and the ownership and Founding partner was back in the talks and responding to each of John's remaining points (Exhibit JK-8). Five days later, on July 29, 2026, Matt Kunz wrote that Fas-Tes now wanted the term cut to three years (Exhibit JK-4).

20. At no time have I told Fas-Tes that Labb would turn off Labb Station or Lab Fusion as a threat to get Fas-Tes to sign the Amendment, and I am not aware of anyone at Labb doing so. Labb Station and Lab Fusion have remained in operation throughout all of our discussions. The only discussion of retiring Lab Fusion took place within the term-sheet negotiations for the proposed new agreement which was to occur after the Amendment was signed. And, only discussed retiring Lab Fusion after all franchisees had moved to the new platform under a new agreement, since there would be no reason to maintain a platform no one was using. What we were negotiating was how long that conversion from the old platform to the new platform would take; Labb's first draft proposed keeping Lab Fusion operational through the end of 2027 (Exhibit JK-

6). However, since no new agreement was signed, any discussion of turning off the current platforms stopped.

21. Matt Kunz and I did agree, jointly, to turn off one function within the Lab Fusion platform. Direct Read, the feature that allows results from tests not purchased from Labb to be entered into the Labb system. We agreed jointly to disable it in an effort to reduce franchisees' ability to use outside tests, and this was announced in the July 13, 2026 memorandum issued under both of our names (Exhibit JK-9). I also agreed to Matt's request that if a franchisee needed Direct Read restored for a legitimate reason, Labb would turn it back on for that franchisee. For example, on July 15, 2026, Matt Kunz forwarded me a request from the operators of Fastest Labs of Addison, who explained that they used only Labb test kits and relied on Direct Read during onsite testing. I reviewed the location and restored Direct Read the same day, replying: "I have checked on them and they look good. I have turned them on." (Exhibit JK-9A.) Before Fas-Tes filed this action, and since, Labb has already restored Direct Read for most Fastest Labs locations as we confirm the certified users, even if they did not request it.

22. The July 2–3, 2026 text exchange also shows which party was setting conditions. When I proposed settlement payments tied to milestones before a new agreement, Matt Kunz refused, writing: "Make the hundred thousand dollar payment start when we have an agreement and I'm ready to move to terms. Otherwise, we need to change the conversation to how do we unwind this?" Labb accepted his position the same day. (Exhibit JK-2.)

23. Before the July 13, 2026 memorandum was issued, Fas-Tes's own CEO put in writing that Fas-Tes had found exclusivity violations in its system. On July 10, 2026, after a call with me that day, Matt Kunz emailed me, copying John Smith, with his proposed language for the notice to franchisees. His proposed language stated: "While we have been digging into data, we

have discovered violations of the exclusive POCT requirement with Labb. This is unacceptable and must be corrected." It further stated: "We need all franchise owners to become compliant and stay compliant going forward for this relationship with a key vendor and Fastest Labs to remain on good standing." Mr. Kunz's proposed language also provided that violations found after July 31, 2026 would result in "[a] default of their franchise agreement subject to an audit of that owners purchase history going back as far as December 2022," and in payments by the offending franchisee to Labb "at a rate of $5 per each laboratory test purchased through a third-party vendor." That evening, Mr. Kunz wrote that he was "fine moving the date to immediate compliance expectation." On July 11, 2026, he wrote: "Okay, we have to word this carefully to protect our rights under the franchise agreement. Go ahead and revise the memo and send it over." (Exhibit JK-9.)

24. The Smith Declaration states that Fas-Tes "strongly refutes" that widespread breaches occurred and that Labb produced "no concrete evidence" (¶ 6). One week after signing the Amendment, Fas-Tes's own CEO told every franchise owner the opposite. On July 13, 2026, Matt Kunz sent an email to all Fastest Labs owners, copying me, stating:

> "The attached memorandum is response to our recent finding that many owners are using drug test kits purchased from vendors other than Labb. This memorandum serves as a formal cease and desist notice regarding this activity for those franchisees."

25. The attached memorandum, issued jointly under Matt Kunz's name and mine, stated that the exclusivity requirement "is not being met everywhere, and it needs to be corrected right away"; that Labb's audit "draws on data from multiple sources, including information provided by the Fastest Labs Home Office"; that Direct Read capability was being turned off for all Fastest Labs locations; and that, "As permitted under the Agreement, Labb will begin random,

periodic compliance reviews." Matt Kunz distributed it to the franchise system himself. (Exhibit JK-9).

26. Labb had also given Fas-Tes specific examples before the Amendment was signed. On July 2, 2026, I emailed Matt Kunz and John Smith, reporting data Labb's finance and customer service staff had compiled. That email was not a formal notice; it was part of a working discussion among the three of us about how to resolve the problem together. Among other examples, I wrote: "Your Henderson franchisee logged 2,700 POC tests into the system over the past 12 months, but zero POC tests were purchased from LABB during that period. That was just one of his locations." The 2,700 figure given in that email was rounded from Labb's underlying data, which Labb retains. (Exhibit JK-10).

27. The $100,000 figure in Section 3 of the Amendment came out of the pricing negotiation. After I proposed a base platform fee plus a revenue-based fee (¶ 18), John Smith countered at $250 per month plus $150 per $10,000 of revenue, but wanted the new fees to begin only in January 2027. I responded that the new pricing should begin when the agreement was signed. On July 1, 2026, John Smith proposed that, if the new fees waited until January 1, 2027, Fas-Tes would pay Labb $10,000 per month for three months in the interim. That evening I declined that proposal. (Exhibit JK-10A.) On July 2, 2026, "taking into account Matt's point about giving franchisees proper notice before any price increase and needing to delay any increase until September 1, 2026," I proposed pricing of $249 and $149 effective September 1, 2026, and that Fas-Tes pay $100,000 — in place of the interim payments Fas-Tes had already offered — in resolution of past damages. (Exhibit JK-10.) Matt Kunz and I then negotiated when and how the $100,000 would be paid, by email and in the July 2–3 text exchange, ending with "$100k (4 payments of $25k) when the agreement is signed." (Exhibit JK-2.)

28. Throughout these discussions, Labb offered Fas-Tes alternatives rather than a single demand: franchisees could come into compliance and use Labb's approved laboratories; franchisees could pay a $499 monthly fee that allowed them to use any laboratory; or the parties could negotiate a new agreement changing the terms Fas-Tes did not like. The $499 option was not new. Before I joined Labb, Labb had offered it to franchisees in writing, including by an email and enrollment form sent to all franchisees. One franchisee pays that fee. My June 24 and July 1, 2026 emails referred to that option as one of the available alternatives. (Exhibit JK-10A.)

29. Labb also provided specific figures in writing after the Amendment was signed. On July 14, 2026, I emailed John Smith figures for the two Miami locations operated by franchisee Monica Wilson: over the twelve months ending June 30, 2026, 2,132 tests run, 1,864 of them entered by Direct Read; over the fourteen months ending June 30, 2026, 775 tests purchased from Labb; and 742 tests still showing in her inventory. As I wrote, "Not sure how she ran 2132 tests and only depleted inventory by 32 tests." (Exhibit JK-11.) On July 15, 2026, I sent John Smith the figures for the Henderson, Nevada franchisee's two locations: 2,992 tests performed over the twelve months ending June 30, 2026, 2,888 of them by Direct Read, against 325 tests purchased over fourteen months, with 699 test kits still in inventory. (Exhibit JK-11A.)

30. Paragraph 9 of the Smith Declaration quotes my July 15, 2026 email removing the George locations from the list and my July 21, 2026 email, but omits my July 20, 2026 email to John Smith, sent in the same thread in response to his request that I "outline what you've actually found and what remains outstanding." I wrote:

> "We only worked on three. George's we have determined could be accounted for in the numbers. However Ilan was not sorted out. The pictures he sent do not explain the vast difference we found. Plus the 'inventory' he had then has not changed compared to amount of tests done. Thus we stand behind the numbers we found. Concerning Monica

we provided the numbers and are looking to you for more info on her numbers and how she explains them to you."

31. That is, of the three franchisees Labb reviewed in depth, one was removed from the list after Labb's own further review, and Labb stood behind its findings as to the other two. The full thread is attached as Exhibit JK-12. The planned call with Monica Wilson and further review of her locations did not occur due to scheduling issues with setting a time to talk and then Fas-Tes ended negotiations before we could talk.

32. The George locations were removed from the list after Labb's further review - covering passports, document and test uploads, laboratory tests, breath alcohol tests, fourteen months of purchases, and current inventory - provided explanations for the difference. In a telephone call, John Smith and Matt Kunz also told me that the Georges had called them and given similar reasons for why the difference might be showing. As a sign of good faith, and because the Amendment was then in place, I removed the Georges from the list and focused on the other two franchisees.

33. As to my July 15 statement that among "about 160 other sites" the differences "between tests run, direct reads and purchases are minor": that review was an initial screen using very limited data within Labb's own system: comparing POCT tests run and Direct Reads against POCT purchases. (Review did not include Lab Testing violations) "Minor" meant the differences at those sites were proportionally smaller than at the flagged locations, not that none existed; the sites reviewed were generally smaller, lower-volume locations. John Smith's declaration also omits that the franchise system had roughly 90 other locations beyond those 160 sites and the three flagged franchisees. Labb's initial data review showed larger discrepancies at those roughly 90 locations, but they were not part of the discussions at that point, primarily because the Amendments was signed and we were "moving" towards a new agreement. The initial review also

could not detect laboratory-based testing sent to laboratories other than Labb's approved laboratories, because such specimens never pass through Labb's system.

34. The parties narrowed the review for practical reasons. On July 1, 2026, John Smith himself wrote that establishing violations across the system "certainly can't be done in less than 90 days." (Exhibit JK-10A.) My July 21, 2026 statement that "We did not continue going through anymore at this point" referred to the fact that, when the Amendment was signed, the parties agreed that Labb would pursue only the three flagged franchisees rather than conduct individual audits across the system. As I wrote in the same email, "At this point we have an agreement so I am not going further since we stated what we would do." Labb's decision not to pursue every location was a concession made in reliance on the Amendment, not a finding that no breaches occurred.

35. Evidence of use of outside labs also comes from sources outside Labb. On September 3, 2026, Trisha Long of Quest Diagnostics reported to Labb that Fastest Labs franchisees were ordering far more Quest urine collection kits and custody forms than the number of specimens they sent to Quest for testing. Quest's spreadsheet shows, for the preceding twelve months system-wide, 27,332 tests run against 43,725 urine kits and 50,885 forms ordered, with extreme gaps at individual locations. For example, Quest performed 4 tests for Fastest Labs of El Cajon, while that location ordered 725 collection kits; and Quest performed 4 tests for Fastest Labs of Nashville, while that location ordered 500 collection kits. Quest's finance team calculated $24,589.50 in unaccounted-for kits and $11,776.50 in unaccounted-for forms. A true and correct copy is attached as Exhibit JK-13. The Quest data also showed other franchisees that processed ZERO specimens through Quest.

36. I have also reviewed a December 31, 2024 email from Fastest Labs' onboarding department, signed by its Director of Onboarding, to a new franchisee, listing among the Home

Office's responsibilities for the new location the setup of accounts with USDTL and CRL — laboratories that are not Labb-approved laboratories. (Exhibit JK-14.) Labb's records include other Fastest Labs Home Office onboarding emails to new franchisees reminding them to set up their CRL and USDTL accounts, or offering to help them do so. (Exhibit JK-14A, collectively.) Labb's records also include franchisee support tickets seeking results for specimens sent to non-approved laboratories and franchisee requests for supplies and custody forms for non-approved laboratories.

37. The complete picture has been unavailable because Fas-Tes controls the franchisee-level records and has refused to produce them. Labb requested the underlying data before suit. Labb's notice of breach and demand for audit was mailed August 11, 2026 and delivered August 18, 2026. At an in-person meeting on September 3, 2026, in San Antonio, Texas, Fas-Tes's counsel stated that Fas-Tes had not started an audit and would not conduct one unless Labb first specified every individual franchisee breach. Paragraph 6 of the Smith Declaration confirms that Fas-Tes considers an audit not "warranted or reasonable."

38. My communications with the Fastest Labs franchise system about the Amendment, pricing, or exclusivity were issued either jointly with Fas-Tes or with Fas-Tes's advance agreement that Labb would communicate. The July 13, 2026 memorandum was prepared with Fas-Tes. That day I sent John Smith successive drafts, including a final version adding Matt Kunz as a signer; John Smith replied that he expected "to get it out EOD as discussed"; and Matt Kunz sent it to all owners himself. (Exhibits JK-9, JK-9B.)

39. Section 1.1 of the Amendment required Fas-Tes to announce the new fee structure to its franchisees, and before the Amendment was signed the parties agreed that Labb would then send its own notice. My July 2, 2026 email proposed that "Fastest Labs will notify franchisees of this change within 5 days of this agreement" and that "LABB will follow up with its own

notification within 3 days of your notification date." (Exhibit JK-10.) Matt Kunz agreed to that sequence in the July 3 text exchange (¶ 15; Exhibit JK-2). When I returned the countersigned Amendment on July 6, 2026, I wrote: "Let me know when you have let the franchisees notification go out and we can followup." (Exhibit JK-1A.) Fas-Tes sent its notice on July 7, 2026 (Exhibit JK-3), and Labb's own communication, which Mr. Ramsey sent and addresses in his declaration, followed on August 3, 2026. Labb's communications addressed the new pricing and the platform it related to. Labb has never sent franchisees the Amendment itself or a notice describing its other terms.

40. Apart from those communications, Labb communicates with franchisees for many legitimate, ordinary business reasons, as it has since 2022. These include failed-payment notices; operational questions from franchisees about testing, results, supplies, and the platform; laboratory questions; communications with franchisees who are also members of Labb's Channel Partner Program, including notices of new POCT tests, services, and other products; and communications with franchisees who asked to test the new platform. Fas-Tes welcomed that development work: when Mr. Ramsey sent John Smith and Matt Kunz an update on the new platform in May 2026 and asked for their input, John Smith replied, "This is awesome James," and closed, "Looking forward to the demo and Alpha!" (Exhibit JK-16A.)

41. I did not disclose to any franchisee which franchisees were identified in Labb's review. To my knowledge, the flagged franchisees first contacted Labb after Matt Kunz and John Smith confronted them. Labb has not conducted any "smear campaign" (¶ 13), and I am not aware of anyone at Labb calling franchisees to disparage other franchisees.

42. Paragraph 15 of the Smith Declaration refers to a "previous agreement with Labb to cease such communications." I am not aware of any such agreement. Fas-Tes's counsel demanded in writing that Labb stop communicating with franchisees; Labb did not agree.

43. Since the dispute began, the communications directing franchisees on disputed matters have come from Fas-Tes. On September 1, 2026, Matt Kunz emailed all franchise owners, copying Mr. Smith, describing the new fee as unauthorized, instructing owners not to sign or agree to the new terms, and directing them to route questions to Fas-Tes rather than Labb; the same message was posted to the Fastest Labs owners' online group. A true and correct copy is attached as Exhibit JK-15. On August 3, 2026, Matt Kunz had told all franchisees that they "will not experience the previously communicated increase on September 1," although he had signed the Amendment setting that increase. (Exhibit JK-16.)

44. Paragraph 18 of the Smith Declaration states that Labb "imminently intend[s]" to shut off the software franchisees currently use. Labb has not shut off Labb Station or Lab Fusion and has no plan to do so. Labb's earlier plan, discussed in the scope of negotiations described in paragraph 20, was to retire the current system only after all franchisees had migrated to the new platform under a new agreement. With those negotiations ended, that plan no longer applies. Roughly six years remain in the ten-year term of the Agreement, and Labb has no plan to terminate it. Labb will continue to maintain and support the current system to the extent the Agreement requires. If a franchisee does not pay amounts owed, including the fees under Section 1 of the Amendment, Labb will follow the procedures the Agreement provides. Franchisees are not required to move to the new platform.

45. Labb has continued to provide all products and services to Fastest Labs franchisees since September 1, 2026, and has followed its standard collections practice without change. Since

that date, approximately 12 to 15 franchisee payments have failed, 5 franchisees have filed credit card chargebacks, and approximately 20 to 25 franchisees have asked Labb to remove their payment method on file. For each chargeback, Labb has provided its credit card processor with documentation supporting the charge, as the processor requires so that Labb is not penalized for charges treated as fraudulent.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on October 2, 2026, in Norfolk, Virginia.

Jeffery Konecke
President, Ramsey Diagnostics Corporation d/b/a Labb